**TOWN OF BELMONT, et al.,**
**Plaintiffs, Appellees,**

v.

**Elizabeth DOLE, United States Secretary of Transportation, Defendant, Appellant.**

**No. 83–1871.**

United States Court of Appeals, First Circuit.

Argued April 4, 1985.

Decided June 27, 1985.

Thomas H. Pacheco, Washington, D.C., with whom Robert L. Klarquist, F. Henry Habicht II, Asst. Atty. Gen., Washington, D.C., W. Steven Thayer, III, U.S. Atty., and Bruce E. Kenna, Asst. U.S. Atty., Concord, N.H., were on brief, for defendant, appellant.

Edward A. Haffer, Manchester, N.H., with whom Peter S. Cowan and Sheehan, Phinney, Bass & Green Professional Ass'n, Manchester, N.H., were on brief, for plaintiffs, appellees.

Randall Y.K. Young, Deputy Atty. Gen., and Michael A. Lilly, Atty. Gen., Honolulu, Hawaii, on brief, for State of Hawaii, amicus curiae.

John J. Beall, Jr., Sr. Asst. Atty. Gen., Richard L. Walton, Jr., Asst. Atty. Gen., Walter A. McFarlane, Deputy Atty. Gen., and Gerald L. Baliles, Atty. Gen., Richmond, Va., on brief, for Com. of Va., amicus curiae.

Roland A. Eckert, Richard A. Christopher, Sp. Asst. Attys. Gen., and Neil F. Hartigan, Atty. Gen., Chicago, Ill., on brief, for People of State of Ill., amicus curiae.

John P. Krill and Barbara S. Drake, Deputy Gen. Counsel, Office of Gen. Counsel, John M. Hrubovcak, Asst. Counsel, Dept. of Transp., and Michael H. Kline, Asst. Counsel, Dept. of Transp., Harrisburg, Pa., on brief, for Com. of Pa., amicus curiae.

Before COFFIN, BREYER and TORRU-ELLA, Circuit Judges.

BREYER, Circuit Judge.

Section 4(f) of the Department of Transportation Act says in part that the Secretary of Transportation may not approve a project

> requiring the use of ... land of an historic site of national, State, or local significance (as determined by the Federal, State or local officials having jurisdiction over the ... site)

unless there is no "prudent and feasible alternative to using that land." 49 U.S.C. § 303. (*See* Appendix for full text.) *See also* 23 U.S.C. § 138. In October 1980 the Secretary promulgated a set of regulations that, in part, concerns historic sites of archeological value. The relevant paragraph said that

> archeological sites on or eligible for inclusion on the National Register [fall within the scope of § 4(f)'s definition] ... unless the Administration, after consultation with the State Historic Preservation Officer and the Advisory Council on Historic Preservation, determines that the archeological resource is important chiefly for the information it contains and has minimal value for preservation in place.... [In that event the] archeological resouces ... may be recovered in accordance with a resource recovery plan developed in compliance [with a different set of regulations, contained in 36 C.F.R. Part 800] ...

23 C.F.R. § 771.135(f)(1)(1984). (*See* Appendix for full text.) The issue in this case is whether this "archeological regulation" is consistent with the statute. The district court held that it was not, declared the regulation void, and issued an injunction based on that finding. Before this court, appellees have argued vigorously that the regulation departs from the "plain mean-

ing" of the statute. Their argument is a strong one. Nonetheless, having looked into the matter in some depth, we conclude that the regulation does not conflict with the statute's language, properly understood, and that the "archeological regulation" in fact furthers the statute's preservationist goals. Hence, we reverse the district court's decision.

## I

### A.

Since the district court, in effect, declared the regulation invalid on its face, we shall examine it in light of the government's version of the facts. They include the following: The federal Department of Transportation (DOT) and the New Hampshire Department of Public Works and Highways wish to build a twelve-mile, four-lane bypass to relieve highway congestion along a corridor of U.S. 3—N.H. 11 between Franklin and Laconia, New Hampshire. The bypass route they have proposed runs through the towns of Tilton and Belmont. In 1977 they published a draft environmental impact statement. In 1976, 1978 and 1980 various federal and state officials involved with the highway project surveyed the proposed bypass route to determine whether it contained any "historic sites." As a result of the 1978 survey, New Hampshire found and created a special zone, the Lochmere Archeological District. The District consists of about 90 acres of land containing Indian and colonial settlement sites with buried artifacts but no historic buildings. As New Hampshire's State Preservation Officer wrote, when he successfully applied to have the National Park Service list the District in its National Register of Historic Places, the site's significance is "strictly archeological," consisting of the data it contains. DOT consulted relevant state and federal agencies, all of which have agreed with DOT about this characterization. DOT has agreed that

> [The state and federal highway agencies] will develop an appropriate data recovery program, which meets the approval of the NH State Historic Preservation Office and Advisory Council on Historic Preservation, for any sites determined to be eligible for inclusion in the National Register.
>
> [The state and federal highway agencies] will conduct the data recovery at the earliest possible date under the supervision of an archeologist whose qualifications have been determined acceptable by the State Historic Preservation Office.

Together with DOT, these agencies are now developing a satisfactory "retrieval" plan that will preserve significant data and artifacts, though not necessarily where now buried.

### B.

In considering the "archeological regulation's" lawfulness, it is important to keep in mind the following 'legislative' background: DOT promulgated the regulation pursuant to its general rulemaking power to implement Congressional transportation statutes, *see* 23 U.S.C. § 315. DOT intended the regulation to further, not only the purposes of § 4(f), but also those of a different statute (enacted the same day as § 4(f)), the National Historic Preservation Act of 1966, 16 U.S.C. §§ 470 *et seq.* Section 106 of that Act requires DOT (and other federal agencies) to "take into account the effect" of any "undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register," and to give the "Advisory Committee on Historic Preservation ... a reasonable opportunity to comment" on the "undertaking." *Id.* § 470f. (*See* Appendix for full text.) When promulgating its "archeological regulation," DOT explained how it reconciled and fulfilled the purposes of both § 4(f) and the Preservation Act, as follows:

> A related problem has arisen with respect to archeological sites which are treated as historic sites under both section 4(f) and the National Historic Preservation Act. Frequently, the consultation required by section 106 [of the NHPA, 16 U.S.C. § 470f] results in a

determination that data recovery is the appropriate form of mitigation for the archeological site. Such determinations are typically made when the recovery of the material contained in or on the site renders more valuable information than leaving such material at the specific location. Applying section 4(f) to archeological sites where data recovery is appropriate would impose the section 4(f) test to sites for which all interested agencies have agreed that removal of the archeological material is in the best public interest. This regulation incorporates current DOT policy by applying section 106 and section 4(f) to archeological sites sequentially. If data recovery under section 106 is appropriate, then section 4(f) would not apply, since recovery results in the removal of materials which make the site significant for purposes of section 4(f). It should be noted that section 4(f) continues to apply to archeological sites on or eligible for the National Register where the site has significance for reasons other than the materials contained.

45 Fed.Reg. 71,976 (1980). The "archeological regulation" thus says in essence that DOT, in accordance with procedures set out elsewhere (in 36 C.F.R. Part 800) will consult with state and federal preservation officials, both to determine the applicability of its "archeological regulation" and to develop an appropriate retrieval plan. *See* 36 C.F.R. Part 800 (1984) (implementing the Preservation Act). DOT promulgated the initial version of this regulation in 1980, as part of a far larger proposed regulation dealing with § 4(f). DOT apparently received 196 comments from interested parties. 45 Fed.Reg. 71,968 (1980). DOT then summarized and discussed significant comments when promulgating the final regulation. Judging from this discussion, no environmental group or archeological group seriously opposed the "archeological regulation" subsection.

### C.

 Our task on this appeal is to determine the lawfulness of an agency's "legislative rule"—a rule that is lawful if "rea-

sonable" and not "contrary" to the relevant statutes. *Schweiker v. Gray Panthers,* 453 U.S. 34, 43–44, 101 S.Ct. 2633, 2639–40, 69 L.Ed.2d 460 (1981); *Batterton v. Francis,* 432 U.S. 416, 424–26, .97 S.Ct. 2399, 2404–06, 53 L.Ed.2d 448 (1977); *Mayburg v. Secretary of Health and Human Services,* 740 F.2d 100, 106 (1st Cir.1984); *see generally* 2 K. Davis, *Administrative Law Treatise* § 7:8 (1979). We consider that rule in light of the factual assumptions set forth in part IA, above, namely that DOT and others have fully complied with the rule and with related regulations. Indeed, we consider its lawfulness on the still more favorable assumption that the relevant State official "having jurisdiction" (the State Historic Preservation Officer), the relevant federal preservationist agencies (including the Advisory Committee on Historic Preservation established under the Preservation Act), and DOT all agree about both the regulation's applicability and the likely creation of a satisfactory "retrieval" plan. We also consider the rule in light of its history set forth in part IB above, namely that the regulation is aimed at serving the purposes of both § 4(f) and the Preservation Act.

## II

Given our assumptions, we conclude that the "archeological regulation" is lawful. It is consistent with § 4(f), because neither the language nor the purpose of that section requires DOT to determine whether there exists a "prudent and feasible" alternative to use of the land that the regulation describes. Thus § 4(f) does not require DOT to choose any such alternative route instead of the land in question.

First, as a matter of language, we fail to find any necessary conflict between statute and regulation. The statute applies to "the use of . . . land of an historic site of national, State, or local significance." The regulation picks out those archeological sites whose significance lies only in the data they contain that will be at least equally well preserved outside the site. Once the data is removed, the land lacks the neces-

sary "significance." The process of removal itself cannot be considered an *adverse* "use" of the site as long as it does not injure but preserves the objects in question. And, the word "use" in the statute refers to a use that is *adverse* in terms of the statute's preservationist purposes, a "use" that might *"harm"* the resources the statute seeks to protect, 49 U.S.C. § 303(c)(2) (emphasis added). *See Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir.1982) ("the term 'use' is ... not limited to the concept of physical taking, but includes areas that are significantly, adversely affected by the project"); *D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1239 (D.C.Cir.) ("harm" to recreational park under § 4(f) encompasses "noise, air pollution and general unsightliness" that might "dissipate its aesthetic value, crush its wildlife [or] defoliate its vegetation") *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); *Nashvillians Against I–440 v. Lewis*, 524 F.Supp. 962, 976 (M.D.Tenn.1981) (constructive "use" of historic property under § 4(f) occurs only where "the claimed harm will affect the *historic* value or quality of the properties" and where "the purposes for which such properties are protected [are] threatened by the 'use'") (emphasis in original). Indeed, a contrary view of the word "use" would perversely forbid DOT from helping to preserve the environment in any instance in which a project helps, rather than hurts, the environment. (Imagine a DOT project planting trees along the edge of a port, or reconstructing a bridge so as to help free an estuary of pollution making it better fit for wildlife.) *Cf. Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) ("in interpreting the words of a statute," courts have "some scope for adopting a restricted rather than a literal or usual meaning of words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute").

Second, the regulation is consistent with the purpose of § 4(f)—a purpose described in its opening sentence as requiring the United States to make a "special effort ... to preserve the natural beauty of the country-side and public parks and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a). *See generally*, Gray, *Section 4(f) of the Department of Transportation Act*, 32 Md.L. Rev. 327 (1973). As courts and commentators have noted, historic sites, particularly archeological sites, raise special problems, for unlike sea, parks and recreation lands, many of them are in private hands, *see Stop H–3 Association v. Coleman*, 533 F.2d 434, 442 n. 15 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976); and private owners are not necessarily obligated to preserve the sites' historic or archeological value. *See, e.g.*, Lovis, "A Case Study of Construction Impacts on Archeological Sites in Michigan's Inland Waterway," *Journal of Field Archeology* (1978) (in area studied, only two percent of the destruction of all archeological sites was due to federal programs; thirty-eight percent, to commercial ventures; and the rest, to other private developers). Choosing an "alternative" route for a road in order to avoid a public park in all likelihood helps to preserve the park; choosing an "alternative" route for a road in order to avoid an archeological site may well harm the site, at least where the site's only value lies, say, in its buried artifacts, where road building is accompanied by a carefully designed plan to retrieve them, and where the alternative is to leave the site in the hands of private owners free to ignore, or even to harm, its archeological value.

Recognizing this fact, DOT, the Advisory Council on Historic Preservation, and state preservationist agencies have developed an archeological preservationist program, embedded in regulations promulgated pursuant to the Historic Preservation Act, *see* 36 C.F.R. Part 800 (1984), and the regulation at issue here. We are told by four states filing amicus briefs that this program works well. Pennsylvania, for example, in a brief signed by both counsel to its Department of Transportation and counsel to its Historical and Museum Commission,

notes that the state contains over 11,000 archeological sites, and explains how the federal program has helped to advance archeological objectives. It concludes,

> The recovery program created by the Advisory Council Regulations [36 C.F.R. Part 800], which are necessarily triggered by [the "archeological regulation"] has operated successfully in Pennsylvania, fostering cooperation between the Department of Transportation and the Historical and Museum Commission and serving the needs and objectives of both agencies.

To strike down the "archeological regulation" as contrary to § 4(f) would have the perverse effect of interfering with § 4(f)'s preservationist objective, for it would forbid DOT to help retrieve and preserve the buried artifacts as long as the road could be put elsewhere. The state of Illinois, in its amicus brief, describes the possibility as follows:

> If the District Court's decision is upheld, the Department will, no doubt, be faced with the anomalous situation of discovering a significant site which should be salvaged so that the information it contains can be professionally collected, published, and displayed. Instead of completing this task and contributing to the body of knowledge associated with archeology, the Department will be faced with the mandate of Section 4(f) to avoid the site unless no feasible and prudent alternative exists. If such an alternative is found, the site will then be abandoned. The site will be left, in most cases, in private ownership with no absolute restraints against total destruction or vandalism....
>
> If the District Court's decision is not reversed, the Department will be required to shift the focus in its archeological program from its present standard of maximum preservation of valuable information to one of finding significant sites so that they can be avoided and possibly ruined. Instead of serving the historical preservation goal stated in Section 4(f), the Department would be assisting in the loss of irreplaceable archeological resources.

Even if this dismal picture is overdrawn, the vast number of archeological sites that may exist in some areas (Hawaii, for example) suggests that the district court's view, if generalized, could significantly delay or halt road building, improvement, or maintenance in at least some states without significantly furthering any preservationist value. (Here, for example, appellee townships, while anxious to stop the road, have *no particular expertise or institutional interest in archeological preservation.*)

Third, the "archeological regulation," viewed in the context of its accompanying and cross-referenced regulations promulgated under the Preservation Act, *see* 36 C.F.R. Part 800 (1984), contains, as we interpret it, sufficient substantive and procedural safeguards to prevent its being applied in a manner that would undercut its, and § 4(f)'s, preservationist goals. It does not apply and § 4(f) does apply, for example, if the archeological items give a particular site a special "in place" historical or archeological significance. (Consider, for example, the Civil War battle artifacts at Gettysburg.) The regulation also would not apply if it turns out that the related agencies cannot develop a "resource recovery plan" that would remove and preserve the significant items. Finally, we consider here the regulation as applied to a site where "*all*" state and federal officials with "jurisdiction" *agree* that site meets the regulation's definition. (DOT says that they are in agreement; and the district court struck down the regulation on that assumption). We need not now decide how, or whether, the regulation can apply should DOT, for example, believe the site's archeological elements lack "in place" value but the State Historical Preservation Officer or the Advisory Committee on Historic Preservation disagrees. (We note authority, however, for the proposition that a claim by *one* of the state or federal officials with jurisdiction that a particular site falls within § 4(f)'s scope is sufficient to invoke the protection of that statute, *Stop H–3 Association v. Coleman*, 533 F.2d at 441–42.)

## III

We note that appellees seek to dispute one of our factual assumptions. They argue that DOT has not fulfilled the requirements laid down in the "archeological regulation" and related regulations. DOT replies that it has done so. The record is consistent with DOT's claim. Nonetheless, this is a matter the district court should consider in the first instance.

The decision of the district court is

*Reversed and the case is remanded for proceedings consistent with this opinion.*

## APPENDIX

Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303:

**§ 303. Policy on lands, wildlife and waterfowl refuges, and historic sites**

(a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the country-side and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

(b) The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States, in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands crossed by transportation activities or facilities.

(c) The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—

(1) there is no prudent and feasible alternative to using that land, and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

\* \* \* \* \* \*

Section 106 of the National Historic Preservation Act of 1966, 16 U.S.C. § 470f:

**§ 470f. Effect of Federal undertakings upon property listed in National Register; comment by Advisory Council on Historic Preservation**

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking.

\* \* \* \* \* \*

DOT's "Archeological Regulation," 23 C.F.R. 771.135(f) (1984):

(f)(1) Section 4(f) applies to all archeological sites on or eligible for inclusion on the National Register, including those discovered during construction, unless the Administration, after consultation with the State Historic Preservation Officer and the Advisory Council on Historic Preservation, determines that the archeological resource is important chiefly for the information it contains and has minimal value for preservation in place. Such archeological resources which do not warrant preservation in place may be recovered in accordance with a resource recovery plan developed in compliance with 36 CFR Part 800.

(2) For sites discovered during construction, where preservation of the resource in place is warranted, the Section

APPENDIX—Continued

4(f) process will be expedited. In such cases, the evaluation of feasible and prudent alternatives will take account of the level of investment already made and the review process, including the consultation with other agencies, will be shortened as appropriate.