**PRESERVATION COALITION OF ERIE COUNTY Plaintiff,**

v.

**FEDERAL TRANSIT ADMINISTRATION, et al. Defendants.**

**No. 99–CV–745S.**

United States District Court, W.D. New York.

Feb. 23, 2000.

---

Francis C. Amendola, Richard G. Berger, Buffalo, NY, for Plaintiffs/Petitioners.

Mary K. Roach, Timothy Hoffman, Buffalo, NY, Alice J. Kryzan, Hamberg, NY, for Defendants/Respondents.

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Plaintiff Preservation Coalition of Erie County has moved this Court for an Order preliminarily enjoining Defendants from engaging in construction at a site identified as the Buffalo Inner Harbor Project.

The Coalition claims that construction currently under way at the Inner Harbor Project threatens the immanent destruction of historic resources that are of great local and national significance. It claims that Defendants violated Federal and state laws that require consideration of the impact of the Project on historic resources and planning to mitigate harm to those resources.

In the interval since the filing of the Complaint and Motion for Preliminary Injunction, Defendants have adjusted their construction plans so that the work presently under way avoids most resources of concern to the Coalition. However, the parties agree that construction work will likely impact on these resources in the near future. Also, the Coalition contends that a portion of the current construction still threatens irreparable harm to historic resources.[1]

This Decision addresses two issues related to the Preliminary Injunction Motion: 1) whether Plaintiff will be permitted to introduce testimony or evidence in addition to the administrative record that is subject to this Court's review; and 2) whether this Court should issue an Order immediately enjoining the first phase of construction.

## BACKGROUND

### I. APPLICABLE STATUTES

■ The Preservation Coalition asserts claims under three Federal statutes which provide for protection of environmental, and particularly historic resources.[2] The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.* requires the preparation of an Environmental Impact Statement (EIS) whenever a federally

funded construction project significantly affects the quality of the environment. NEPA requires the implementing agency to identify resources that might be adversely affected, and consider alternatives that would meet project goals while minimizing harm to the environment. Historic resources are one aspect of the environment that project managers must consider. NEPA is essentially a procedural statute. It requires that an agency to take a "hard look" at environmental consequences of its projects, but does not elevate environmental concerns over other priorities, or prohibit a course of action that may harm resources, so long as the agency justifies its decision. *Sierra Club v. U.S. Army of Corps Engineers,* 772 F.2d 1043, 1050 (2nd Cir.1985).

■ The National Historic Preservation Act (NHPA), 16 U.S.C. § 470 *et seq.* is also an essentially procedural statute. It requires that an agency identify historic resources and consider alternative approaches to a project that would mitigate harm to those resources; however, it does not prohibit projects that may harm such resources, so long as the chosen alternative is justified. NHPA protects resources in, or eligible for inclusion in the National Register of Historic Places. The State Historic Preservation Office (SHPO) is charged with recommending whether to include a resource in the National Register. 16 U.S.C. § 470a. In New York, SHPO is a department within the Office of Parks, Recreation and Historic Preservation.

■ In contrast to NEPA and NHPA, § 4(f) of the Transportation Act, 49 U.S.C. § 303(c), imposes significant substantive limitations on construction projects. Un-

---

**1.** In her letter to this Court dated February 22, 2000, Defendants' counsel confirmed that initial construction, in which the new Naval Basin bulkhead will be installed, is back on schedule.

**2.** The Coalition also asserts a claim under New York State Environmental Quality Re-

view Act (SEQRA), Environmental Conservation Law § 8–0101 *et seq.* SEQRA imposes requirements similar to NEPA. Defendants contend that SEQRA is superceded by the Federal statutes. This Court need not address the state law claim or defenses to that claim in the present Decision.

der § 4(f), a transportation project that impacts a historic site cannot be implemented unless the agency shows that there is no feasible and prudent alternative to the use of the site, and that it has done all possible planning to minimize harm to the site. Where NEPA and NHPA contemplate that a project will proceed so long as alternatives are *considered,* § 4(f) can *prohibit* work on a project unless those two conditions are met. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). § 4(f) and NHPA are interrelated, in that resources eligible for inclusion in the National Register are subject to protection under § 4(f). However, regulations implementing § 4(f) provide that it does not apply to:

> [an] archeological resource [that] is important chiefly because of what can be learned by data recovery and [that] has minimal value for preservation in place.

23 C.F.R. § 771.135(g)(2). This regulation does not exempt every resource deemed "archeological." It only applies if a site is considered an archeological resource *and* its importance lies chiefly in data that can be retrieved. As discussed below, SHPO's determination that the Inner Harbor Project site meets this "archeological exception" is a key point of contention in this case.

## II. INNER HARBOR PROJECT

The Buffalo Inner Harbor Project, a component in a broader scheme for developing the city's waterfront, incorporates a variety of improvements on a tract of land that adjoins the waterfront. New York State Urban Development Corporation, doing business as Empire State Development Corporation ("ESDC") is the lead agency with regard to environmental review of the project. ESDC has prepared a Final Environmental Impact Statement ("FEIS") that identifies ways that the Inner Harbor Project may impact the environment and discusses alternative approaches to minimize harm to the environment. According to the FEIS, the Inner Harbor Project is intended to achieve the following goals: 1) enhancement of access to and transportation options at the Inner Harbor; 2) encouragement of recreational use of the Project site and private development of adjoining properties; and 3) enhancement of the attractiveness of the location. (FEIS, at ES–4, 5). Each of these goals is broken down into a number of more concrete objectives. (Id.)

The site of the Inner Harbor Project is bounded by Main Street, Hanover Street, Pearl Street, Marine Drive, Marine Court and the Buffalo River. According to the Preservation Coalition, this site is historically very significant.

> [T]he project site includes the westernmost terminus of the Erie Canal. Historically, the Erie Canal terminated at the Buffalo River within the Inner Harbor project site and was connected to the river by two canal slips known as the Commercial Slip and the Prime Slip, both of which are located within the Inner Harbor Project site. The Inner Harbor Project site also includes the historic sites of Prime Street, Dayton Street, Hanover Street, Lake Street and Commercial Street.

Complaint ¶ 22. The layout of these resources dates to the opening of the Erie Canal in 1825. Some of the oldest residential, industrial and commercial development in Buffalo's history occurred at this site, which was a critical juncture in the route that commercial vessels took from the Great Lakes to central and downstate New York *via* the Erie Canal and a jumping off point for much 19th Century migration to mid-western United States *via* the Great Lakes. (Plaintiff's Memorandum, Item no. 2, at 2–3.)

However, the location has undergone considerable construction and demolition in intervening years, and was used most recently as a parking lot. Consequently, ESDC consulted SHPO and also hired archeological experts to assess the likelihood

that intact historic resources remain below the surface at the Project site. Warren Barbour, Ph.D., who has been involved in evaluating those resources since shortly after the inception of the Inner Harbor Project, has submitted an affidavit describing his efforts and his conclusions. (Item no. 10, ex. 2). Barbour concludes that:

a quiet, peaceful, historic city [does] not lay below [the Project site] waiting to emerge. To the contrary, the Project area, like ... [other historic sites] that I have worked at over the last thirty-four years, had been built, torn down and rebuilt multiple times over the course of its history and with a look more to the future than a concern for the past.

(Barbour aff. ¶ 8.)

Based on Barbour's conclusions and supporting data, SHPO determined that the Inner Harbor Project would have no adverse effect on historic resources. (Ex. F to Aff. of Robert D. Kuhn, Item no. 9.) This finding was based on SHPO's conclusion that the cite includes mainly "archeological" resources that are significant because of "their potential to yield important information through excavation." (Kuhn aff. ¶ 5.)

SHPO conditioned its finding of "no adverse impact" on ESDC's taking additional steps to identify and assess resources at the Project site. It recommended that a further archeological excavation, termed "Phase III mitigation" be undertaken and that SHPO be consulted regarding resources found during the excavation. (Kuhn aff., ex. F.) The Phase III excavation, which was conducted after completion of the FEIS, uncovered an extant portion of one wall of the Commercial Slip and remains from some of the adjoining streets and buildings. Dr. Barbour consulted with a number of experts in archeological preservation and concluded that the wall of Commercial Slip would suffer serious damage if left exposed to the elements. He therefore recommended that the wall be buried. (Barbour aff. ¶ 13.) SHPO concurred with this recommendation. (Kuhn

aff. ¶¶ 25–26.) The Project now contemplates construction of a replica slip near the location of the original Commercial Slip.

## III. DISPUTE OVER THE NECESSITY FOR ADDITIONAL TESTIMONY OR EVIDENCE

All of the Coalition's claims relate to the development of the FEIS and to decisions that Defendants made, consistent with the FEIS, regarding preservation of resources at the Project site. The parties agree that the FEIS and its supporting exhibits comprise the administrative record that is subject to this Court's review. However, the Coalition contends that those documents do not include adequate information to enable this Court to determine whether Defendants complied with the Federal laws, and that additional testimony and evidence is required to make that determination. Defendants disagree. They argue that the administrative record is sufficient and that no additional testimony or evidence is required.

On February 5, 2000, this Court sent a letter to all counsel advising counsel to be prepared to discuss the question of additional testimony at the next scheduled status conference. The letter identified the following as issues that Plaintiff's counsel contend require additional testimony or evidence.

a) Did the FEIS define the purpose of the Inner Harbor Project too narrowly?

i) Is there adequate support in the FEIS for the conclusion that there is no feasible alternative to the Inner Harbor Project, as described therein?

b) Is there adequate support in the FEIS for the conclusion that the Inner Harbor Project site is of value only for archeological purposes?

i) Is there adequate support in the FEIS for the conclusion that disturbance to the Inner Harbor Project site during subsequent construction and demolition eliminated all historic

structures and resources that would have been worthy of protection under Federal law?

c) Given events that occurred subsequent to issuance of the FEIS, should Defendants have prepared a Supplemental Environmental Impact Statement?

i) Is there adequate support in the FEIS for the conclusion that the Commercial Slip is the only resource at the Inner Harbor Project site that is eligible for inclusion in the National Register of Historic Places?

ii) Is there adequate support in the FEIS for the conclusion that the wall of the Commercial Slip must be covered over, to preserve it?

iii) Is there adequate support in the FEIS for the conclusion that construction of a replica slip is a feasible alternative to restoration of the remnants of the Commercial Slip?

The letter also directed Plaintiff to advise the Court if it contended that other issues require additional testimony or evidence.

At a recent status conference on February 8, 2000, counsel presented their respective positions with regard to the need for additional testimony or evidence. Defendants' Counsel suggested that this question would be more clearly presented if the Coalition identified the witnesses that it proposed to call and the topics that each witness would address. The Court agreed, and directed Plaintiff to submit a list of proposed witnesses and testimony. The Coalition has submitted an Offer of Proof, which identifies the following six witnesses:

Robert Z. Melnick, Dean of the School of Architecture, University of Oregon, and author of the original *Guidelines for the Treatment of Cultural Landscapes,* National Parks Service, 1980. Dean Melnick offers to testify regarding the application to the Project site of guidelines for considering whether it qualifies for inclusion in the national register, and regarding application of the "archeological exception."

Mark Goldman, Ph.D., Urban History and David Gerber, Ph.D. both offer to testify about the history of the Canal District and the significant contribution of the Erie Canal to the broad patterns of the nation's history.

Rossman F. Giese, Ph.D., professor of Geology, State University of New York at Buffalo and Patricia M. Costanzo, Ph.D., both offer to testify about the composition and durability of the stone composing the wall of the Commercial Slip.

Dan Rogers, Ph.D., offers to testify regarding the feasibility of treatment and restoration of the Commercial Slip. (Item no. 28, at 6–7.)

Defendants have responded to the Offer of Proof. (Item no. 29.) This Court must now determine whether additional testimony or evidence, is required.

## IV. PLAINTIFF'S REQUEST FOR AN IMMEDIATE INJUNCTION

Plaintiff's counsel also submitted a letter detailing the Coalition's concerns regarding construction that is currently underway. (Item no. 19.) That construction, which will create a new docking area for ships in the Buffalo and Erie County Naval Museum, involves placing a number of metal sheet pilings at the western end of the site so that excavation of the Buffalo River can begin. Although the Coalition agrees that the revised schedule postpones construction on most areas of concern, it contends that the new anchorage for Naval Museum ships will "preclude the development of Commercial Street as part of the historic district," and will require placing the Naval Museum building at a location that would prevent development of other historic resources. It also contends that current construction irrevocably commits resources that will make it too expensive to ever develop the site according to the Coalition's plan. (Id.) At a subsequent status conference, Plaintiff's counsel revised its position, contending that some of the exhibits in the FEIS suggest that rem-

nants of Commercial Slip may also exist at the site of the immediate construction.

Defendants argue that the immediate construction will not impact on any intact resources. They contend that Commercial Street is not eligible for inclusion in the National Register and that, in any event, there are no remnants of Commercial Street or Commercial Slip intact at the site identified by the Coalition. Defendants point to two proposals that the Coalition submitted during the EIS review process, both of which called for re-utilization of this spot, (FEIS, figures 2.4–3 and 2.4–4), and argue that these plans amount to an implicit concession that resources at this particular location need not be preserved. Defendants also state that, if any significant resources are uncovered during the present phase of construction, ESDC's agreement with SHPO requires that construction immediately cease until Dr. Barbour and SHPO assess the significance of those resources.

## DISCUSSION

### I. ADDITIONAL TESTIMONY OR EVIDENCE

■■■ A district court's review of an administrative agency's determination is generally governed by the "record rule" which requires that the court confine itself to the record compiled by the agency when it made its decision. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985). In NEPA cases the record typically consists of the FEIS, although it can also encompass other documents. However, the "record rule" cannot always be strictly applied in NEPA cases because of the obligation that the statute places on agencies to affirmatively identify ways that a project may affect the environment.

[B]ecause NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, [ ] review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record. To limit the judicial inquiry regarding the completeness of the agency record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA. The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention. Thus, we have held that the consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives.

*National Audubon Soc. v. Hoffman,* 132 F.3d 7, 14–15 (2nd Cir.1997), citing *County of Suffolk v. Sec'y of the Interior,* 562 F.2d 1368, 1384 (2nd Cir.1977). However, even in NEPA cases, deviation from the "record rule" is limited. Courts may consider additional information "only when the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed action." *National Audubon Soc.,* 132 F.3d at 15, citing *Sierra Club,* 772 F.2d at 1051–52. The record compiled by the agency will often be sufficient for the court to make this determination. *National Audubon Soc., id.* Based on these criteria, this Court makes the following findings regarding admission of additional testimony or evidence.[3]

---

**3.** Although the Court and counsel have referred to "supplemental" testimony and evidence, *National Audubon Soc.* held that additional testimony or evidence must be considered as "extra-record" submissions, and not as a supplement to the administrative record under review. This distinction is based on the function of the additional submissions, which are intended to enable the Court to determine the adequacy of the FEIS, and not to amend that document. 132 F.3d at 15–16.

## A. Purpose of the Project, Feasibility of Alternatives

The Coalition contends that its proposals for developing the Inner Harbor Project site will better preserve historic resources at the site, while enabling the Project to meet all of the goals defined in the FEIS. The Coalition's proposals were rejected on the ground that they would prevent achievement of some of the Project goals. (FEIS 2–25, 2–26.) It contends that Defendants' rationale for rejecting its proposals was based on a misconstruction of the Project goals as stated in the FEIS, and a false assessment of the feasibility of the Coalition's proposals. Defendants have identified the portions of the FEIS in which the goals of the Inner Harbor Project are defined and where the Coalition's proposals are discussed. **The contents of the FEIS appear to be sufficient, and additional testimony or evidence do not appear to be required for the Court to address these issues.**

## B. "Archeological Exception"

The FEIS concludes that the Project "includes all possible planning to minimize harm to [historic] resources," as required by § 4(f) of the Transportation Act. (FEIS, 6–10.) This conclusion is premised on a determination[4] that the "archeological exception" to § 4(f) applies, i.e. that the Project site is "important chiefly because of what can be learned by data recovery and has minimal value for preservation in place." 23 C.F.R. § 771.135(g)(2). The Coalition vigorously contests this finding, arguing that the site's significance extends beyond data that may be recovered.

More specifically, Federal criteria for the National Register of Historic Places "are worded in a manner to provide for a wide diversity of resources." 36 C.F.R. § 60.4. There are four alternative bases for consideration, two of which are relevant to the present discussion. The latter two are that a site can be considered if it is "associated with events that have made a significant contribution to the broad patterns of [American] history," or if it is "ha[s] yielded, or may be likely to yield, information important in prehistory or history." 36 C.F.R. § 60.4(a) and (d). Generally, a site that is significant only under criterion (d), i.e. because of information it is likely to yield, might qualify for the "archeological exception;" but a site that is significant under both (a) and (d), i.e. both for data recovery and because it is associated with important historic events, would not qualify for the "archeological exception," since it would not be "important chiefly because of what can be learned" from the data.

There is surprisingly little reported case law interpreting the "archeological exception." However, a First Circuit decision, *Town of Belmont v. Dole*, 766 F.2d 28 (1st Cir.1985), explains the rationale for the rule. In rejecting the plaintiffs' argument that the "archeological exception" subverted the purpose of § 4(f) the court reasoned:

> [t]he statute applies to "the use of ... land of an historic site of national, State, or local significance." The regulation picks out those archeological sites whose significance lies only in the data they contain that will be at least equally well preserved outside the site. Once the data is removed, the land lacks the necessary "significance." The process of removal itself cannot be considered an adverse "use" of the site as long as it does not injure but preserves the objects in question.

*Town of Belmont*, 766 F.2d at 31–32. The "archeological exception" does not apply

---

4. The original text of this Decision referred to "*SHPO's* determination that the 'archeological exception' to 4(f) applies." As Defendants' counsel has pointed out, the regulation provides that a determination as to the applicability of the "archeological exception" is to be made by "the [Federal Highway] Administration, *after consultation with the* SHPO." The text of this Decision has been revised to reflect this difference. The citation has also been revised to reflect its present source, 23 C.F.R. § 771.135(g)(2).

if the archeological items give a particular site a special "in place" historical or archeological significance. (Consider, for example, the Civil War battle artifacts at Gettysburg.)

*Id.*, at 33.

The Coalition contends that the Inner Harbor Project site has been associated with many significant historical events, including the opening of the Erie Canal, settlement of upstate New York, migration to mid-western United States, and patterns of commerce and industrial development that defined the character of this region. Therefore, it argues, Defendants erred in deeming the site significant only for archeological data. **The immediate question for this Court is whether there is sufficient information in the FEIS and its exhibits to enable the Court to decide this issue.**

There is considerable information related to this issue in the text of the FEIS, and in Dr. Barbour's reports regarding his investigation of the Project site, which are exhibits to the FEIS. The FEIS acknowledges that

[t]he proposed site of the Inner Harbor project has a rich and complex history which embraces the entire history of the city of Buffalo, including early habitation by a number of Native American groups, European entry into the region in the 17th century and eventual occupation of western New York in the 18th century. The greatest level of activity on the site occurred in the middle and late 19th century, with the construction of an extensive canal system that included the Erie Canal, a network of local feeder canals and slips, and the development of Buffalo as a transshipment center for grains and other goods. Early maps and photographs of the project site depict a complex system of canals, slips, and streets, and an active and varied warehousing area.

(FEIS, 6–4 to 6–5.) This conclusion is consistent with Dr. Barbour's findings in the report of his "Phase IA" literature search. (Barbour ex. A, at 7–11.) In that report, Barbour described the types of historic resources likely to be found beneath the surface, including brothels, taverns, light industry, remnants of Commercial and Prime Slips and other artifacts related to 19th century lake transport. (Id., at 11–15.) He concluded that, although "the majority" of these structures were likely demolished during urban renewal in the 1950's, "lower layers and foundations of buildings from the 1830 through 1860 period are likely to be intact in over 50 per cent of the project area" and Prime Slip also is likely to be intact. (Id., at 2, 11–16.) Barbour therefore recommended that sub-surface exploration be done to assess the extent of recoverable historic resources. (Id., at 39.)

Sub-surface exploration was eventually done in three successive stages: Stages IB and II, which took place prior to issuance of the FEIS; and Stage III, which was termed a "mitigation measure," and took place after the FEIS was issued. As noted in the FEIS, "[t]he Stage IB Investigation indicated that historic cultural resources related to the early commercial center of Buffalo both exist and are recoverable on the project site;" and "Stage II indicated evidence that intact resources exist in various locations on the project site, including those associated with former industrial operations, canal resources (e.g. Commercial Slip and Prime Slip), as well as evidence of former residential inhabitation on the project site." (FEIS, at 6–5, 6–6.)

Barbour's report of the findings from the "Stage II" excavations concluded:

it appears that portions of the project area may meet National Register Criteria A and D [5] and potentially contain data for addressing regional and national contexts. It also contains research potential to address questions concern-

---

**5.** This appears to be a reference to 36 C.F.R. § 60.4(a) and (d), quoted *supra*, at page 545.

ing the structure of nineteenth century industrial and commercial development. These deposits have the potential to yield significant information on the daily workings of Buffalo's waterfront and canal system.

The project area appears to merit additional testing and appears to be eligible for inclusion in the National Register for Historic Places. [I], therefore, recommend that a Stage III archeological investigation be undertaken.

(Barbour ex. D, at 2.)

Based on Barbour's reports, SHPO concluded that the "archeological exception" applied to the Project site, and therefore that the Project would have no adverse impact on historic resources. Robert D. Kuhn, who was responsible for SHPO's review of the Project, gives the following explanation for invoking the "archeological exception."

Excepting the vessels harbored in the Niagara river, there are no above ground buildings or structures that are more than 50 years old [at the Project site]. In fact most of the [site] is a vacant parking lot. Therefore the entirety of the Section 106 review was primarily focused on the potential effect of the project on underground archeological resources. In many respects, archeological remains are categorically different from other historic properties such as buildings or structures. Archeological sites and remains are below ground whereas buildings and structures are above ground. The importance of archeological sites is usually based upon their potential to yield significant information about our past whereas buildings and structures are usually evaluated based on other criteria. The integrity of an archeological site is evaluated based upon its potential to yield important information through excavation whereas the integrity of a building or structure is evaluated based upon its potential to continue to function for an intended use.

Kuhn aff. ¶ 5. The Preservation Coalition contends that this explanation is premised on a false dichotomy, in which "below ground" is equated with "archeological" and "above ground" is equated with "historic." It contends that, once SHPO adopted this false premise, its conclusion was inexorable: nothing remains above ground, hence the site's only significance is archeological. It argues that SHPO's approach ignores the significance of the project site to the history of Buffalo and the nation, and the importance of extant resources in conveying the site's place in history.

Defendants contend that the contents of the FEIS and its exhibits are sufficient to enable this Court to decide this issue, and that additional testimony would be redundant. (Item no. 29, at 5–7.) However, the difficulty with relying solely on the record as a basis for addressing the "archeological exception" issue is not that there is a dearth of information, but that the information in the text of the FEIS and in its exhibits appears to be ambiguous. Information in the FEIS and in Dr. Barbour's reports certainly suggests that the Project site has significance because of important historic events that took place there. Those documents stress the overarching role that this site played in Buffalo's history and in national patterns of migration, commerce and industry. This would seem to rebut the conclusion that resources at the Project site are of value "chiefly" for data recovery, or that they have "minimal" value for preservation in place.

Defendants are entitled to explain the rationale underlying their position. However, the Coalition also should be permitted to establish a basis for its argument that SHPO misapplied the "archeological rule." **The present record is insufficient to enable this Court to rule on this issue. In particular, additional testimony or evidence seems called for with regard to the following questions.**

**1) What do the terms "archeological" and "historic" mean in this context?**

2) **Do extant resources at the Project site have a historic importance beyond their capacity to yield archeological data?**

3) **Did SHPO improperly equate "archeological" with "underground," and discount the historic context of the Project site and its contents?**

## C. Necessity for a Supplemental EIS

 Preparation of a supplemental EIS "is at times necessary to satisfy [NEPA's] 'action-forcing' purpose." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989). An agency need not supplement an EIS every time new information comes to light. However, if the new information shows that the Project will "affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh,* at 374, 109 S.Ct. at 1859. (Internal quotation omitted.) An agency's decision that a supplemental EIS is not required must be upheld by this Court unless it was arbitrary or capricious. *Marsh,* at 375–76, 109 S.Ct. at 1860, citing APA, 5 U.S.C. § 706(2)(A). The court

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one. When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evalua-

tion of the significance—or lack of significance—of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation "of the relevant factors."

*Marsh,* at 378, 109 S.Ct. at 1861. (Internal quotation omitted.)

The Coalition argues that a series of significant events occurred subsequent to the FEIS and are not addressed in that document. Those events include the Stage III excavation, discovery of an intact wall of the Commercial Slip, Dr. Barbour's inquiries regarding appropriate methods of preserving the wall, Dr. Barbour's conclusion that the Slip wall should be buried to preserve it, SHPO's concurrence with this conclusion, the decision to construct a "replica" slip near the location of the original Commercial Slip, and a proposal by an architectural firm retained by the Coalition to preserve the Commercial Slip wall above ground and use it as part of a functioning slip.

Defendants argue that the FEIS anticipated these developments and therefore a supplemental EIS is unnecessary. They contend that no additional testimony is required since this Court can decide the issue based on the contents of the FEIS, and that Plaintiff's offer of proof is irrelevant to the only issue properly before this Court. (Item no. 29, at 10–12.)

The FEIS certainly anticipated the Stage III excavation. (FEIS, 6–6). Indeed, its conclusion that the Project includes "all possible planning to minimize harm" to historic resources (Id., 6–10), is premised in part on Phase III being undertaken as a "mitigation" effort. The FEIS describes the approach to be followed during Stage III in some detail. (Id., 5–19 to 5–21.) It is clear that one goal of the excavation was to search for remnants of Commercial Slip and Prime Slip, and that the specific sites to be excavated were chosen with that goal in mind.

(Id., 5–20 and Fig. 5.3.1.) It is also clear that the FEIS contemplated consultation with SHPO regarding resources discovered during Phase III.(Id.) indeed such consultation was an explicit condition to SHPO's approval of the Project. (Kuhn aff., ex. E.)

However, the administrative record is limited in two respects. **First, neither the FEIS nor its exhibits discusses the environmental implications of the sequence of events following discovery of the Commercial Slip wall: Dr. Barbour's consultation with preservation experts, his conclusion that the Slip wall should be buried, the decision to build a "replica" slip, or the Coalition's alternate proposal.** Although, in a sense, the FEIS "anticipated" these events or some variation on them, by requiring consultation with SHPO regarding discoveries during Stage III, this is not the same as explicitly *addressing* the environmental implications of the discovery of the Commercial Slip wall and the subsequent events, as is required under NEPA.

Also, the function of the FEIS process under NEPA is twofold. It requires that the implementing agency take a "hard look" at the environmental consequences of a proposed action, and it enables the public to review and comment on the proposed action in light of the environmental concerns identified by the agency. *Marsh,* 490 U.S. at 371, 109 S.Ct. at 1858. "[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time." *Id.,* citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349–50, 109 S.Ct. 1835, 1845–46, 104 L.Ed.2d 351 (1989). Even though Defendants may have taken a "hard look" at the alternatives once the Commercial Slip wall was discovered, it is impossible to determine, based on review of the present record, whether Defendants' chosen course of action was properly subjected to public scrutiny or public comment, as required by NEPA.

Of course, such scrutiny is not required unless the new developments suggest that the Project will "affect the quality of the human environment in a *significant* manner ... not already considered," in the FEIS. *Marsh,* 490 U.S. at 374, 109 S.Ct. at 1859. (Emphasis supplied.) The parties' dispute as to the significance of post-FEIS developments is at the heart of their contention. **It is on this point that the text of the FEIS and its exhibits is deficient, and on which additional testimony is required.**

**D. Plaintiff's Proposed Witnesses**

Based on its conclusion that additional testimony and evidence is proper with regard to the applicability of the "archeological exception" and the necessity for a supplemental EIS, the Court determines that Plaintiff may call the following witnesses.

1) Either Mark Goldman or David Gerber may testify on the historic significance of the Canal District and its extant resources.

2) Dean Robert Z. Melnick may testify on the method of assessing eligibility of a site for inclusion in the National Register of Historic Places, including the applicability of the "archeological exception" to resources at the Inner Harbor Project site.

3) Dan Rogers may testify on the feasibility of restoring and exposing Commercial Slip.

Plaintiff may also use one of the above witnesses to establish facts relating to its allegation of irreparable harm.

The testimony of each witness subject is to his or her qualification as an expert on the matters upon which he or she offers opinions. Testimony should not duplicate the contents of the FEIS, but should provide additional information required for this Court to decide the issues underlying the Preliminary Injunction Motion. For Dean Melnick and either Dr. Goldman or

Dr. Gerber, the relevant issue is whether application of the "archeological exception" to the Project site was arbitrary and capricious. For Dr. Rogers, the issue is whether developments after the FEIS was issued brought to light significant environmental concerns not considered in the FEIS.[6]

This Court declines to admit testimony from Rossman F. Giese or Patricia M. Costanzo. Plaintiff states that these witnesses would "testify to the composition and durability of stone composing the wall of the Commercial Slip, and in particular that the stone will retain its integrity for thousands of years." (Item no. 28, at 6–7.) Such testimony appears to go to the merits of the Coalition's proposal to expose and utilize the Commercial Slip wall instead of burying the wall. As Defendants note, it is not this Court's role to determine the relative merits of Defendants' and the Coalition's proposals regarding the Commercial Slip wall. (Item no. 29, at 12.) The Court's role is limited to determining whether the FEIS process was conducted in accordance with Federal law. At this juncture of the proceedings, testimony from Dr. Giese or Dr. Constanzo does not appear to be required to decide that narrower question. However, Plaintiff may reiterate its request if it should appear that testimony from either witness is, in fact, required.

Defendants have taken the position that additional testimony is not required, and have not submitted a list of prospective witnesses. Defendants may propose rebuttal witnesses, subject to the same restrictions as Plaintiff's witnesses.

## II. PLAINTIFF'S REQUEST FOR AN IMMEDIATE INJUNCTION

■ Preservation Coalition requests that this Court issue an immediate Order enjoining construction at the Inner Harbor Project site during the time it takes this Court to hear testimony and render a decision on the Preliminary Injunction Motion. A prerequisite to such an immediate injunction is a showing that the Coalition's interests will suffer irreparable harm if the *status quo* is not maintained during the interval until a decision on the Preliminary Injunction Motion is rendered. *Warner Bros. Inc. v. Dae Rim Trading Inc.*, 877 F.2d 1120, 1124–25 (2nd Cir.1989).[7]

The Coalition has not made that showing. In particular, the Coalition has not demonstrated the likelihood that this first phase of construction will impact on an extant portion of the Commercial Slip or Commercial Street. Nor has it shown, at this stage of the litigation, that Commercial Street is eligible for inclusion in the National Register of Historic Places, hence subject to protection under NEPA or § 4(f) of the Transportation Act. Nor has it shown that any negative impact on the narrow portion of the Project site affected by current construction would be so harmful to the overall scheme that the Coalition proposes for utilization of the site, that it could be considered an irreparable injury to the Coalition's interests. Finally, De-

---

6. Defendants contend that Plaintiff's offer of proof regarding Dean Melnick's testimony is internally inconsistent and is based on a false premise regarding the eligibility of resources for inclusion in the National Register. (Item no. 29, at 3–5.) This Court need not and does not address those arguments in the context of the present decision, the function which is simply to determine whether additional testimony is required and to define generally the parameters of that testimony. Defendants may specific raise relevancy and materiality objections, based on the proper scope of each witness' testimony at the time that such testimony is proffered.

7. *Warner Bros.* involved an application for a Temporary Restraining Order ("TRO"). Since, in the present case, Defendants were given notice of, and an opportunity to contest Plaintiff's application, the requested relief cannot be termed a TRO. Fed.R.Civ.P. 65(b). However, the basic principle defined in *Warner Bros.* applies to the present situation, since the purpose of the requested Order is to maintain the *status quo* "until the court has an opportunity to pass upon the merits of the demand for a Preliminary Injunction." 877 F.2d at 1125.

fendants have confirmed that current construction is proceeding subject to the condition that construction will cease if any resources are discovered, and will not resume until both SHPO and Dr. Barbour are able to assess the significance of those newly discovered resources.

Given these circumstances, Plaintiff has failed to meet its burden of showing irreparable harm, and its request for an immediate order enjoining construction pending this Court's decision on the Motion for a Preliminary Injunction is denied.

## ORDER

IT HEREBY IS ORDERED:

1) Plaintiff may introduce additional testimony from the following witnesses: a) Either Mark Goldman or David Gerber; b) Dean Robert Z. Melnick; and c) Dan Rogers. Such testimony shall not duplicate contents of the Final Environmental Impact Statement or its exhibits, but shall provide additional information required for this Court to decide the issues underlying the Preliminary Injunction Motion.

2) This Court will not admit testimony from Rossman F. Giese or Patricia M. Constanzo.

3) Defendants may propose rebuttal witnesses, subject to the same restrictions as Plaintiff's witnesses.

4) Plaintiff's request for an Order immediately enjoining construction on the Inner Harbor Project, pending this Court's decision on Plaintiff's Preliminary injunction Motion is denied.

SO ORDERED.