**PRESERVATION COALITION OF ERIE COUNTY Plaintiff,**

v.

**FEDERAL TRANSIT ADMINISTRATION, et al. Defendants.**

**No. 99–CV–745S.**

United States District Court, W.D. New York.

March 31, 2000.

Francis C. Amendola, Richard G. Berger, Buffalo, NY, for Plaintiffs/Petitioners

Mary K. Roach, Timothy Hoffman, Buffalo, NY, Alice J. Kryzan, Hamberg, NY, for Defendants/Respondents.

**DECISION AND ORDER**

SKRETNY, District Judge.

## TABLE OF CONTENTS

INTRODUCTION ............................................................554
BACKGROUND ...........................................................554
 I. Applicable Statutes..............................................554
 II. Buffalo Inner Harbor Project.........................................556
 III. Archeological Exploration At The Inner Harbor Site......................557
 IV. "No Adverse Effect" Determination ..................................558
 V. Stage III Excavations ...........................................559
DISCUSSION ............................................................560
 I. Plaintiff's Standing..............................................561
 II. Scope Of Review And The Record Subject To Review......................562
 III. Preliminary Injunction Standard Of Proof..............................563
 A. Likelihood of Success: Plaintiff's Arguments .......................564
 1. Definition of Project Goals .....................................565
 2. Archeology Exception ........................................565
 3. Supplemental EIS ..........................................569
 B. Irreparable Harm .........................................572
 1. Harm to Members' access to Commercial Slip Wall .................573
 2. Harm to the Proposal to Incorporate Commercial Slip Wall in to
 a Functioning Slip ........................................573
 3. Harm to Other Resources ....................................576
IN SUMMARY ..........................................................576
CONCLUSION AND ORDER ...............................................577

### ABBREVIATIONS AND ACRONYMS

The following abbreviations and acronyms are used in this Decision:

APA—Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

EQRA—Environmental Quality Review Act

NEPA—National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*

NHPA—National Historic Preservation Act, 16 U.S.C. § 470, *et seq.*

§ 106 of NHPA—(§ 106, process— when agency consults with SHPO over proper treatment of historic resources).

§ 4(f) § 4(f) of the National Transportation Act, 49 U.S.C. § 303

. . . . .

EIS—Environmental Impact Statement

FEIS—Final Environmental Impact Statement

SEIS—Supplemental Environmental Impact Statement

SEQRA—State Environmental Quality Review Act, New York Environmental Conservation Law, § 8–0101, *et seq.*

SHPO—State Historic Preservation Office

. . . . .

National Register—National Register of Historic Places

"Criterion A" and "Criterion D"—criteria for inclusion in the National Register, found at 46 C.F.R. § 60.4, note.

"Stage IA," "Stage IB," "Stage II" and "Stage III"—stages in archeological investigation of the Inner Harbor Project site, conducted by firm of Warren Barbour, Ph.D.

ESDC—Empire State Development Corporation (d/b/a New York State Urban Development Corporation)

FTA—Federal Transit Administation

NFTA—Niagara Frontier Transit Authority

NYSTA—New York State Thruway Authority

OPRHP—Office of Parks, Recreation & Historic Preservation

SUNY—State University of New York

## INTRODUCTION

Plaintiff Preservation Coalition of Erie County (Preservation Coalition or Coalition) has moved this Court for an Order preliminarily enjoining Defendants from engaging in construction at a site identified as the Buffalo Inner Harbor Project. The Coalition claims that construction at the Inner Harbor Project site threatens the imminent destruction of historic resources that are of great local and national significance. It claims that Defendants violated Federal and State laws that require consideration of the impact of the Project on historic resources and planning to mitigate harm to those resources.

This Court in its prior decision rendered on February 23, 2000 in this case, determined that the administrative record was insufficient to enable the Court to determine the issues essential to deciding the Preliminary Injunction Motion, and that the Coalition would therefore be permitted to call three witnesses. (Item no. 30, at 17, 20–21.) Those three witnesses, David Gerber, Ph.D., Daniel Rogers and Robert Z. Melnick, Ph D., testified on February 29, 2000. This Court then granted Defendants' request to call a rebuttal witness, Robert D. Kuhn. Ph.D., who testified on March 6, 2000.

Now, upon the parties' submissions and the testimony and evidence before this Court, Plaintiffs Motion for a Preliminary Injunction is granted in part and denied in part for the reasons stated in the discussion that follows.[1]

## BACKGROUND

### I. APPLICABLE STATUTES

Preservation Coalition asserts claims under three Federal statutes which provide for protection of environmental, and par-

---

1. Counsel for Plaintiff and Defendants agree that the Administrative Record consists of the Final Environmental Impact Statement and the documents listed in the affidavit of Anthony Carr (Item no. 6.) Those documents include 1) Transcript of Public Hearing, August 4, 1997. 2) Transcript of Public Scoping Hearing, November 24, 1997. 3) Final Scoping Document, January 1998, with comments. 4) "End of field" letter for Stage IB. 5) Stage IA Cultural Resources Literature Search. 6) Draft Stage IB Report, June, 1998. 7) Draft Transcript from DEIS hearing, November 16, 1998. 8) Research Design for Stage III Mitigation, October, 1998. 9) Request for Comment to Advisory Council on Historic Preservation. 10) Record of decision, FTA, June 22, 1999. The FEIS and supporting documents were filed January 7, 2000 as exhibits to the affidavits of Rachel Shatz, Warren Barbour and Robert Kuhn. Since they are exhibits to numbered submissions and not freestanding items, they do not have individual item numbers.

 Plaintiff has submitted the following numbered items. Complaint (Item no. 1), Motion for Preliminary Injunction with Supporting Memorandum of Law (Item no. 2), Reply Memorandum (Item no. 14), Offer of Proof (Item no. 28), Supplement to Offer of Proof (Item no. 36), Affidavits (Items no. 18, 19), Proposed Findings of Fact and Conclusions of Law (FOF–COL) (Item no. 42), and Reply to Defendants' Proposed FOF–COL. (Item no. 44.) Also, at the Court's request Plaintiff's counsel submitted a letter, February 3, 2000, defining its position with regard to irreparable harm.

 Defendants have submitted Memoranda of Law on behalf of Federal Transit Administration (Item no. 7), New York State Thruway Authority and Office of Parks, Recreation and Historic Preservation (Item no 8), and Niagara Frontier Transit Authority and New York State Urban Development Corporation d/b/a Empire State Development Corporation (Item no. 10.) Each of those sets of Defendants also submitted Sur-reply Memoranda (Items no. 22, 23, 24.) Defendants also have submitted Memoranda in Response to Plaintiff's counsel's letter of February 3, 2000 (Item no. 26), and in Response to Plaintiff's Offer of Proof (Item no. 29), as well as a joint Motion in Limine with supporting Memoranda (Items no. 32–35.) an Offer of Proof on Defendants' Rebuttal Witness (Item no. 38), Proposed FOF–COL (Item no. 41.), and Response to Plaintiff's Proposed FOF–COL (Item no. 43.) Also, at this Court's request Defendants have updated this Court regarding the progress of construction in presentations at status conferences, in written submissions, and at a site visit to the Inner Harbor Site.

ticularly historic resources.[2] The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq. requires the preparation of an Environmental Impact Statement (EIS) whenever a federally funded construction project significantly affects the quality of the environment. The EIS

> serves NEPA's "action forcing" purpose in two important respects. It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in [ ] the decision making process.
>
> Publication of an EIS ... gives the public the assurance that the agency has indeed considered environmental concerns in its decision making process and, perhaps more significantly, provides a springboard for public comment.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989) (Internal citations omitted.) In an EIS a "responsible official" must describe the environmental impact of the project, including any unavoidable adverse effects, and consider alternatives that might meet project goals while minimizing harm to the environment. 42 U.S.C. § 4332(2)(C).

NEPA is essentially a procedural statute. It requires that an agency take a "hard look" at environmental consequences of its projects, but does not elevate environmental concerns over other priorities, or prohibit a course of action that may harm resources, so long as the agency justifies its decision. *Sierra Club v. U.S.*

*Army Corps of Engineers*, 772 F.2d 1043, 1050 (2nd Cir.1985).

The National Historic Preservation Act (NHPA), 16 U.S.C. § 470 et seq. requires that any federally funded undertaking "take into account the effect of the undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register" of Historic Places. 16 U.S.C. § 470f. The State Historic Preservation Office (SHPO) is charged with recommending whether to include a resource in the National Register. 36 C.F.R. § 60.3(m). Any agency whose project impacts resources that may be eligible for the National Register must consult with SHPO to determine whether National Register criteria are met, and, if so, whether the project will adversely affect the resources. 36 C.F.R. § § 800.4, 800.5. If the project is likely to have an adverse impact on a protected historic resource, SHPO must be consulted regarding alternative approaches to avoid or mitigate that adverse effect. Id. § 800.6. NHPA, like NEPA, is an essentially procedural statute, which requires planning to avoid or mitigate harm to historic resources, but does not prohibit projects simply because they are likely to cause such harm. *Natural Resources Defense Council v. City of New York*, 672 F.2d 292, 299 (2nd Cir.1982).

Since historic resources are a component of the environment protected by NEPA, *Preservation Coalition v. Pierce*, 667 F.2d 851, 858 (9th Cir.1982), a Federally funded project impacting such resources will be subject to two parallel review processes,

---

**2.** The Coalition also asserts a claim under New York Environmental Quality Review Act (EQRA), Environmental Conservation Law, ~8–0101, et seq. Defendants contend that the EQRA is superceded in the present case by Federal requirements, and that State Defendants have sovereign immunity against Plaintiff's claims under that Act. EGRA imposes similar requirements to NEPA, and Plaintiff has not argued that the state law provides any basis for preliminary injunctive relief different

from the bases that Plaintiff asserts under NEPA. Therefore, this Court will defer a determination on Defendants' defenses to EQRA at this point in the litigation.

Plaintiff also asserts a claim under the Federal Aid Highways Act, 23 U.S.C. § 138. Since that statute imposes requirements identical to § 4(f) of the Transportation Act, this Court will discuss Plaintiff's claims in relation to the latter statute.

the EIS process under NEPA and the consultation process required by NHPA.[3]

Under § 4(f) of the Transportation Act, 49 U.S.C. § 303(c).[4] Federal funding of a transportation project that adversely effects a historic site cannot be approved unless the agency shows that there is no feasible and prudent alternative to the use of the site and that it has done all possible planning to minimize harm to the site. § 4(f) protects resources eligible for the National Register. However § 4(f) does not apply to an archeological resource that is "important chiefly because of what can be learned by data recovery and has minimal value for preservation in place." 23 C.F.R. § 771.135(g)(2).

Where NEPA and NHPA require only that a project consider alternatives that mitigate harm to historic resources, § 4(f) prohibits use of a historic site unless its conditions are met. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). Since Federally funded transportation projects are often subject to NEPA's procedural requirements and the substantive requirements of § 4(f), an agency implementing such a project may opt to document its efforts to comply with § 4(f) in the Project's EIS. Thus, the FEIS in the present case addresses § 4(f) requirements with regard to the Inner Harbor Project.

## II. *BUFFALO INNER HARBOR PROJECT*

The Inner Harbor Project, a component in a broader scheme for developing Buffalo's waterfront, incorporates a variety of improvements on a tract of land that adjoins the waterfront. New York State Urban Development Corporation, doing business as Empire State Development Corporation ("ESDC"), as the lead agency with regard to environmental review, prepared the Final Environmental Impact Statement ("FEIS") for the Inner Harbor Project. The goals of the Project are: 1) enhancement of access to and transportation options at the Inner Harbor; 2) encouragement of recreational use of the Project site and private development of adjoining properties; and 3) enhancement of the attractiveness of the location. (FEIS, at ES–4, 5.) The FEIS addresses a range of environmental issues, including land use, socioeconomic factors, coastal zone management, navigable water, air quality, noise hazardous materials and the visual quality of the setting. (Id., at i— iv.) However, Preservation Coalition's claims focus on the Project's impact on cultural and historic resources.

The Project site is bounded by Main Street, Hanover Street, Pearl Street, Marine Drive, Marine Court and the Buffalo River. According to Preservation Coalition, it is one of the most significant historic locations in Western New York.

> Historically, the Erie Canal terminated at the Buffalo River within the Inner Harbor project site and was connected to the river by two canal slips known as the Commercial Slip and the Prime Slip, both of which are located within the Inner Harbor Project site.

(Complaint ¶ 22.) The site was the locus of much of the earliest commercial, residential and industrial development in Buffalo's history. It was a critical juncture in the route that commercial vessels took from the Great Lakes to central and downstate New York *via* the Erie Canal and a jumping off point for much 19th Century migration to mid-western United States *via* the Great Lakes. (Item no. 2, Tielman aff. ¶ 27.)

---

**3.** Consultation with SHPO is termed the " § 106 process," a reference to the section of the National Historic Preservation Act of 1966, P.L. 89–665, which became 16 U.S.C § 470f.

**4.** The statute, previously codified at 49 U.S.C. § 1653(f), is termed "§ 4(f)" in reference to its numbering in the Department of Transportation Act of 1966, Pub.L. 89–670, 80 Stat. 931.

Preservation Coalition asserts that a variety of resources exist intact at the Project site, including structural remains of the Commercial Slip, and Prime Slip, historic streets such as Lloyd and Hanover Streets, side-walks and foundation remains of buildings and other structures bordering on those streets. It argues that these resources can and should be preserved in place. (Complaint ¶ 24.)

The FEIS acknowledges the historic significance of the Project site, noting that:

[t]he proposed site of the Inner Harbor project has a rich and complex history which embraces the entire history of the City of Buffalo, including early habitation by a number of Native American groups, European entry into the region in the 17th century and eventual occupation of Western New York in the 18th century. The greatest level of activity on the site occurred in the middle and late 19th century, with the construction of an extensive canal system that included the Erie Canal, a network of local feeder canals and slips, and the development of Buffalo as a transshipment center for grains and other goods. Early maps and photographs of the project site depict a complex system of canals, slips, and streets, and an active and varied warehousing area.

(FEIS, 6–4 to 6–5.) However, although Defendants agree that the site is historically significant, they vigorously contest the Coalition's assertion that there are extensive historic resources extant at the site. Thus, Warren Barbour, Ph.D., an archeologist with the firm of Dean and Barbour, which has been involved in evaluating those resources since shortly after the inception of the Inner Harbor Project, concludes that:

a quiet, peaceful, historic city [does] not lay below [the Project site] waiting to emerge. To the contrary, the Project area, like ... [other historic sites] that I have worked at over the last thirty-four years, had been built, torn down and rebuilt multiple times over the course of

its history and with a look more to the future than a concern for the past.

(Item no. 10, ex.2 ("Barbour aff.") ¶ 8.)

## III. *ARCHEOLOGICAL EXPLORATION AT THE INNER HARBOR SITE*

Dr. Barbour's firm was commissioned to conduct archeological exploration in order to determine the likely extent of historic resources at the Project site. That exploration has proceeded in stages. At the conclusion of each stage, Dr. Barbour reported his findings and recommendations and ESDC, in consultation with SHPO, reviewed Dr. Barbour's report and defined goals and parameters for the next stage.

The first stage in Dr. Barbour's work, termed "Stage IA," involved a literature search, to ascertain the types of resources that have been described on maps, in contemporary newspaper, journals and other writings, and in secondary sources. Based on that literature search, Dr. Barbour determined that resources likely to be found sub-surface at the site included taverns, brothels, light industry, remnants of Commercial and Prime Slips and other artifacts related to 19th century lake transport. (Barbour aff. ex. A, at 10–15.) He concluded that, although "the majority" of these structures were likely demolished during urban renewal in the 1950's, "lower layers and foundations of buildings from the 1830 through 1860 period are likely to be intact in over 50 per cent of the project area" and Prime Slip also was likely to be intact. (Id., at 2, 11–1 6.) He therefore recommended that sub-surface exploration be done to assess the extent of recoverable historic resources. (Id., at 39.)

Sub-surface exploration was eventually done in three successive stages: Stages IB and II, which were completed prior to the FEIS, and Stage III, which took place after the FEIS was issued. As noted in the FEIS, "[t]he Stage IB Investigation indicated that historic cultural resources related to the early commercial center of Buffalo both exist and are recoverable on

the project site;" and "Stage II indicated evidence that intact resources exist in various locations on the project site, including those associated with former industrial operations, canal resources (e.g. Commercial Slip and Prime Slip), as well as evidence of former residential inhabitation on the project site." (FEIS, at 6–5, 6–6.)

The Stage IA and II exploration disclosed that the area had been subjected to significant "disturbance" during periods of construction, particularly when a railroad trestle was constructed across the site in the late 19th century. That disturbance likely destroyed significant portions of the infrastructure, including streets and buildings, and called into question the integrity of remaining resources. (Barbour aff. ex. A, at 14–15, 27.) However, in his report of the findings from the "Stage II" excavations Dr. Barbour concluded:

> it appears that portions of the project area may meet National Register Criteria A and D[5] and potentially contain data for addressing regional and national contexts. It also contains research potential to address questions concerning the structure of nineteenth century industrial and commercial development. These deposits have the potential to yield significant information on the daily workings of Buffalo's waterfront and canal system.
>
> The project area appears to merit additional testing and appears to be eligible for inclusion in the National Register for Historic Places. [I], therefore, recommend that a Stage III archeological investigation be undertaken.

(Barbour aff. ex. D, at 2.)

## IV. *"NO ADVERSE EFFECT" DE-TERMINATION*

The Field Services Bureau of the State Office of Parks, Recreation and Historic Preservation serves as New York's SHPO. (Item no. 9 ¶ 1.) On December 8, 1998, SHPO determined that the Inner Harbor Project would have "[n]o [a]dverse [e]ffect on cultural resources in or eligible for inclusion in the National Register of Historic Places." (Item no. 9 ("Kuhn aff."), ex. F.) SHPO set two conditions on its finding of "no adverse effect," that are relevant to the present motion: 1) that ESDC implement its research design for "Stage III Mitigation," which SHPO had previously approved, and 2) that ESDC consult with SHPO "regarding the status of any canal-related commercial slip remains and their appropriate treatment or incorporation into project designs." (Id.)[6]

SHPO's finding of "no adverse effect" was premised in part on its conclusion that the "archeology exception" applied to resources at the Project site. (Kuhn aff. ¶ 10.) Regulations implementing § 4(f) provide that the statute does not apply to an archeological resource that is "important chiefly because of what can be learned by data recovery and has minimal value for preservation in place." 23 C.F.R. § 771.135(g)(2). When the exception applies, "mitigation" focuses on obtaining and recording information from the site, rather than on physically preserving the historic property. Once the information is obtained, damage to the property is not considered an adverse effect under § 4(f). Thus, Robert D. Kuhn, Ph.D., who was responsible for SHPO's review of the Project, refers to "Phase III[7] data recovery excavations designed to mitigate impacts to ... archeological resources." (Kuhn aff. ¶ 12.) Dr. Kuhn gives the following explanation for invoking the "archeology exception."

> Excepting the vessels harbored in the Niagara river, there are no above

---

5. This appears to be a reference to 36 C.F.R. § 60.4, note, discussed at pages 566 *infra*.

6. A third condition related to the relocation of three World War III Era museum ships. (Id.)

7. The terms "Stage III" and "Phase III." are synonymous.

ground buildings or structures that are more than 50 years old [at the Project site]. In fact most of the [site] is a vacant parking lot. Therefore the entirety of the Section 106 review was primarily focused on the potential effect of the project on underground archeological resources. In many respects, archeological remains are categorically different from other historic properties such as buildings or structures. Archeological sites and remains are below ground whereas buildings and structures are above ground. The importance of archeological sites is usually based upon their potential to yield significant information about our past whereas buildings and structures are usually evaluated based on other criteria. The integrity of an archeological site is evaluated based upon its potential to yield important information through excavation whereas the integrity of a building or structure is evaluated based upon its potential to continue to function for an intended use. (Kuhn aff. ¶ 5.)

Preservation Coalition contends that this explanation is premised on a false dichotomy, in which "below ground" is equated with "archeological" and "above ground" is equated with "historic." It contends that, once SHPO adopted this false premise, its conclusion was inexorable: nothing remains above ground, hence the site's only significance is archeological. It argues that SHPO's approach ignores the significance of the project site to the history of Buffalo and the nation, and the importance of extant resources in conveying the site's place in history.

At defendants' request, Dr. Kuhn was permitted to testify, to clarify SHPO's interpretation. Although he agreed that significant historic developments occurred at the Project site, Dr. Kuhn concluded that no existing resources at the Project site had sufficient integrity to qualify as historic buildings or structures, and that the focus of investigation, with regard to National Register criteria, was on whether the site had "integrity as an archeological resource." (K24–26.)[8] He stated that an archeological site is a type of "historic property." However, since it "may no longer function in its original use" it is useful for its "potential to yield information." (K27.)

## V. STAGE III EXCAVATIONS

Beginning in December, 1998, Dr. Barbour supervised the Stage III excavation, which took place in five areas which he had determined "were most likely to yield a representative sample of the diversity of human activity that had gone on within the Project area." (Item no. 10, ex. 2 ¶ 9.) At SHPO's request, the excavation was expanded to cover a greater portion of the site of the Commercial slip. (Id.¶ 11.)

In May, 1999, the excavation uncovered "a roughly eighty foot section of the eastern portion of the Commercial Slip wall as rebuilt in the 1880s." (Id.¶ 12.) According to Dr. Barbour, the wall had been submerged below water level for more then one hundred twenty years. (Id.) On May 18, 1 999, SHPO determined that the Commercial Slip wall met criteria for inclusion in the National Register. (Item no. 9 ¶ 21.) SHPO's determination is set forth in a letter to ESDC, which recommended that

> plans for the Inner Harbor Project should be evaluated to determine if the canal remains can be avoided and protected from project impacts. All prudent and feasible alternatives should be considered to avoid and preserve this resource. In the opinion of SHPO, the paramount significance of this resource dictates that preservation in place should be the first and primary option.

(Item no. 39.)

---

**8.** "K" followed by numeral(s) refers to page(s) of the transcript of Dr. Kuhn's testimony

(Item no. 9, ex. I, at 1.) SHPO also recommended that ESDC

determine if interpretation of the canal remains can be incorporated into the project. Keeping the canal wall exposed with restoration and appropriate historical signage and interpretation in a publicly accessible venue would be the preferred option.

(Id., at 2.) If it was not feasible to keep the wall exposed, SHPO recommended "that the area be carefully filled." However, SHPO stressed that it "would not support removal of the canal wall and reconstruction solely for interpretive purposes, if the wall does not need to be otherwise impacted by the project." (Id.) SHPO also recommended that ESDC take "every opportunity to increase site access, public visitation and tours," and distribute information about the site, because of the "strong public interest" generated by discovery of the canal wall. (Id.)

Dr. Barbour meanwhile consulted with a number of experts regarding the Slip wall, including Dr. Stuart Scott, a retired professor of archeology at State University of New York (SUNY) at Buffalo, who had excavated a similar stone wharf at Fort Niagara in Lewiston, New York. Dr. Scott informed Dr. Barbour that the Fort Niagara wharf "disintegrated after enduring two winters of freezing and thawing." (Id.¶ 13.) Dr. Barbour also consulted with Dr. Charles V. Ebert, a geology professor at SUNY Buffalo. According to Dr. Barbour, Dr. Ebert "confirmed Dr. Scott's assessment and stated that sedentary limestone saturated with water for over a hundred years would blast apart if left exposed to one or two Buffalo winters." (Id. ¶ 13.) Dr. Barbour also observed the condition of blocks from the Slip wall, which had been displaced by prior "disturbance" during construction in 1926. He noted "signs of deterioration" which he attributed to the exposure to the elements. (Id. ¶ 13.)

ESDC commissioned URS Greiner Woodward Clyde ("URS"), engineering consultant to the Project to review and report on the technical feasibility of exposing the wall in place as part of the Project design. (Item no. 10, ex. 1 ¶ 12.) On June 25, 1999, URS recommended that the Commercial Slip wall be covered "for continued preservation and to protect it from disturbance." (Item no. 10, ex. 1(H), at [3]—[4].) A series of meetings ensued including at least one meeting with representatives of preservationist groups, attended by Plaintiff's Executive Director, Timothy Tielman. (Item no. 10 ¶ 12.) Ultimately, Dr. Barbour, Dr. Kuhn, the Project design team and ESDC "came up with a plan that would comply with preservation guidelines." (Id. ¶ 13.) SHPO wrote to ESDC on August 6, 1999, to confirm that it agreed with the conclusion that exposure of the Commercial Slip wall "is not feasible and would be detrimental to the long term preservation of the wall," and therefore that the wall should be covered over. (Item no. 9, ex. L.)

Dr. Barbour concludes that the Stage III excavation

will add to archeological research on the national level. In my opinion, the Project area has been thoroughly sampled and the resulting study of this work will provide scholars and the public with as thorough of an understanding of this part of the City of Buffalo as the extant archeological resources in the area can provide.

(Barbour aff. ¶ 20.)

### DISCUSSION

There are a number of preliminary issues that this Court must address. They include: (I.) Preservation Coalition's standing to assert claims under NEPA, NHPA and § 4(f) of the Transportation Act; (II.) the proper scope of this Court's review of the FEIS and the record that is subject to this Court's review; and (III.) the standard of proof that Preservation Coalition must meet in order to obtain injunctive relief. As such, these issues will be discussed below *ad seriatim.*

## I. *PLAINTIFF'S STANDING*

▆▆ Defendants argue that Preservation Coalition does not have standing to bring this action. Standing is a prerequisite to obtaining injunctive relief. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Defendants contend that "there are no facts alleged tending to establish any injury to health, property, wealth or other legally protected interests of the plaintiff or its members." (Item no. 7, at 10.) However, Preservation Coalition correctly notes that "injury" for standing purposes encompasses harm to aesthetic or cultural interests if the relevant statute was intended to protect such interests. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 886, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990).

The Complaint describes Preservation Coalition as a "membership organization dedicated to the preservation of historic and cultural resources in [Erie] County" whose "members have contributed financially to it in part so that they may obtain adequate representation of their legally protected interests, which ... they could not otherwise individually afford." (Complaint ¶ 6.) It states that "members of the Coalition live ... in the vicinity of, or own or recreate near" the Inner Harbor Project site, and that "[e]ach of the members of the Coalition has a personal interest in the preservation of the historic and cultural resources in Erie County." (Id.¶¶ 6, 7.)

Preservation of historic and cultural resources is within the zone of interests protected by all three Federal statutes upon which the Coalition bases its claims. NHPA declares "that it is a national policy to preserve for public use historic sites, buildings and objects of national significance for the inspiration and benefit of the people of the United States." 16 U.S.C. § 461. An organization dedicated to preserving such resources clearly has standing to enforce NHPA. *Vieux Carre Property Owners v. Brown,* 875 F.2d 453, 459 (5th Cir.1989), cert. denied, 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 739 (1990).

§ 4(f) of the Transportation Act provides "it is the Policy of the United States that special effort should be made to preserve ... historic sites." 49 U.S.C. § 303(a). Therefore, the Coalition's interest in preserving Buffalo's architectural and cultural heritage is within the zone of interests protected by § 4(f). *Benton Franklin Riverfront Trailway and Bridge Committee v. Lewis,* 701 F.2d 784, 787 (9th Cir.1983).

Although the NEPA statute does not specifically refer to historic and cultural resources, it requires an EIS whenever a major Federal action "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). Courts have consistently construed the "human environment" to include historic resources, *Preservation Coalition,* 667 F.2d at 858, and held that organizations dedicated to historic preservation have standing to assert NEPA claims. *Save the Courthouse Committee v. Lynn,* 408 F.Supp. 1323, 1330–31 (S.D.N.Y.1975).

Defendants also argue that the Coalition's interests are based on unsupported speculation regarding historic resources at the Project site. (Item no. 7, at 1 2.) To satisfy Article III's standing requirements, a plaintiff must show that it will suffer an "injury in fact that is (a) concrete and particularized and (b) actual and imminent, not conjectural and hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (Internal quotations omitted.)

▆▆ In a NEPA case, "the relevant showing" for purposes of standing, "is not injury to the environment but injury to the plaintiff." *Friends of the Earth v. Laidlaw Environmental Services,* 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000). Preservation Coalition contends that its interests will be injured in that its members will be denied an opportunity to encounter, appreciate or enjoy historic re-

sources at the project site if they are buried and covered with new construction. Denial of access to a resource can be harm to a protected interest, *Friends of the Earth*, 120 S.Ct. at 704–05, even when the resource itself is not physically destroyed or harmed. *Coalition Against a Raised Expressway v. Dole*, 835 F.2d 803, 812 (11th Cir.1988). (Claim that highway will obstruct view of historic city hall building implicates harm to coalition members' aesthetic interests.)

On the other hand, speculation that historic resources might possibly be buried beneath the ground at the Inner Harbor site would not be a sufficient basis for standing. However, the evidence before this Court, including the FEIS itself, indicates the likelihood that historic and cultural resources are present at the Inner Harbor Project site. The parties disagree as to the proper context for evaluating the historic significance of those resources, and also disagree whether any resources other than the Commercial Slip wall are eligible for the National Register. However, the existence of remnants of Commercial Slip, Prime Slip, building foundations, curbs gutters and other resources is most certainly not speculative, and the Coalition's case for inclusion of those resources in the National Register cannot be termed "speculative."

Since Preservation Coalition has shown that it has an interest in preservation of historic and cultural resources at the Inner Harbor site, that this interest is within the zone of interests protected by NEPA, NHPA and § 4(f) of the Transportation Act, and that the alleged harm to such interests is immediate, concrete and not speculative, this Court finds that the Coalition has standing to bring this action.

## II. *THE SCOPE OF REVIEW AND THE RECORD SUBJECT TO REVIEW*

Since NEPA does not provide a private right of action for its violations, this Court reviews the adequacy of a FEIS under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.* *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). The APA is also the basis for review of alleged violations of § 4(f) of the Transportation Act, *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823, and of alleged violations of the NHPA. *Vieux Carre*, 875 F.2d at 456.

When a district court reviews an agency's decision under APA, the scope of the court's review, and the record that is subject to the court's review are both subject to the requirements of that Act. Under APA, an agency's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Overton Park*, at 416, 91 S.Ct. at 823, *Oregon Nat. Resources Council*, 490 U.S. at 377 n. 23, 109 S.Ct. at 1861 n. 23. The Second Circuit has stressed that, in reviewing the adequacy of a FEIS,

[t]he district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS. The court's task is merely to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decision maker to fully consider and balance the environmental factors.

*County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1383 (2nd Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) (internal citations omitted.)

■ Under APA, the Court "review[s] the whole record." 5 U.S.C. § 706. A district court need not, and should not develop a record *ab initio*, but should rely on the agency record, where that is feasible. *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988). However, the court can supplement the record

with testimony on new matters when "the agency's record is so sparse as to make judicial review ineffectual." *Sierra Club*, 772 F.2d at 1052. In NEPA cases,

> the focal point for judicial review should be the [EIS] ... [However,] a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored.

*County of Suffolk*, 562 F.2d at 1384 (internal citations omitted.) Supplemental testimony may be required "when the reviewing court simply cannot evaluate the challenged action on the basis of the record before it." *National Audubon Society v. Hoffman*, 132 F.3d 7, 14 (2nd Cir. 1997).

In its prior Decision, this Court, upon review of the FEIS and its exhibits, held that additional testimony was required on three issues, and that Preservation Coalition could call one witness to testify on each issue. (Item no. 30, at 21.) The Coalition subsequently called the following witnesses: David Gerber, Ph. D., on the historic significance of the Canal District; Dean Robert Z. Melnick on National Register criteria and application of the "archeology exception" to resources at the Inner Harbor Project site; and Daniel Rogers on the feasibility of restoring and exposing Commercial Slip.

Such testimony is not part of the "record" subject to this Court's review under the APA, but is "extra-record evidence".

> The case law permits a reviewing court to consider evidence beyond that which is contained in the administrative record in certain circumstances. But, no good authority exists to permit a reviewing court to add evidence that will actually be included as part of an agency-compiled record. Hence ... we review the parties' additional submissions as extra-record evidence.

*National Audubon Society*, 132 F.3d at 15–16.

The Supreme Court has stressed that a district court's "inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825, citing *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941). However, in a NEPA case, "the bare record may not disclose [all] the factors that were considered." *Overton Park*, *id.* Therefore testimony or an affidavit detailing the considerations that went into the decision making process is sometimes required. *Id.* However, in the final analysis, it is the sufficiency of the FEIS and its exhibits which is subject to Preservation Coalition's claims, and affidavits or testimony that include *"post hoc"* explanations for Defendants' decisions are not an adequate substitute for the FEIS if the latter is deemed inadequate under NEPA standards. *Id.*, at 419, 91 S.Ct. at 825.

## III. *PRELIMINARY INJUNCTION STANDARD OF PROOF*

■ Ordinarily, a party seeking a preliminary injunction

> has two options: it must either demonstrate a likelihood of success on the merits or it must raise sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. However, in a case in which the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should only be granted only if the moving party meets the more rigorous likelihood-of-success standard.

*Bery v. City of New York*, 97 F.3d 689, 694 (2nd Cir.1996) (internal quotations omitted.)

Defendants argue that the Inner Harbor Project is government action taken in the

public interest pursuant to a statutory and regulatory scheme, and that Plaintiffs must meet the likelihood-of-success standard in order to obtain preliminary injunctive relief. Preservation Coalition contests this point; however, it has not provided any authority or rationale supporting its contention that the less rigorous "fair ground for litigation—balance of hardships" standard is applicable in the present case.

Some earlier Second Circuit decisions suggest that both standards are applicable in a NEPA case. *See State of New York v. Nuclear Regulatory Com'n,* 550 F.2d 745, 750 (2nd Cir.1977) (to obtain a preliminary injunction, movant must meet either likelihood of success, or serious questions—balance of hardships standard.) *Britt v. United States Army Corps of Engineers,* 769 F.2d 84, 88 (2nd Cir.1985) (same.) However, in at least one recent decision, the Second Circuit held that the plaintiff was not entitled to a preliminary injunction, since it "has failed to show a likelihood of success on the merits on its claim that the proposed [government action] violates NEPA." *County of Seneca v. Cheney,* 12 F.3d 8, 12–13 (2nd Cir.1993). *Cheney* makes no mention of the alternate standard; however, the court's discussion of the NEPA claim suggests that plaintiff would not meet that standard, since the court held that there were no serious issues going to the merits of the claims. *Id.*

It is clear from the FEIS that the Inner Harbor Project is a government project in the public interest. Its goals are to develop a tract of property for the public's use and enjoyment by providing a range of recreation and transportation opportunities and increasing public access to Buffalo's waterfront. Also, it is clear that the Project is subject to a very extensive statutory and regulatory scheme, which includes the interrelated Federal require-

ments of NEPA, NHPA and § 4(f) of the Transportation Act with their respective regulations, as well as New York statutory requirements under EQRA and the State Historic Preservation Act. This Court therefore holds that the Coalition must show irreparable harm and likelihood of success on the merits in order to obtain a preliminary injunction against construction at the Inner Harbor Project.[9]

## A. *Likelihood of Success: Plaintiff's Arguments*

Preservation Coalition contends that its proposals for developing the Inner Harbor Project site will better preserve historic resources at the site while enabling the Project to meet all of the goals defined in the FEIS. The Coalition claims that Defendants' rationale for rejecting its proposals was based on a misconstruction of the goals of the Inner Harbor Project as stated in the FEIS as well as a false assessment of the feasibility of the Coalition's proposals.

Preservation Coalition also claims that Defendants misapplied the "archeological exception" to § 4(f) of the Transportation Act, thereby erring in its conclusion that the project would have no impact on historic resources at the Project site. It also argues that Defendants considered resources at the site only as archeological resources, and therefore failed to assess the historic value of these resources in a proper context.

Preservation Coalition also contends that the Stage III excavation and its aftermath—including discovery of the Commercial Slip wall, evaluation of the durability of the Slip wall, and the decision to bury the wall in order to preserve it—constitute new information and events that implicate environmental issues in a significant man-

9. Although this Court decides the Preliminary Injunction Motion under the "likelihood of success" standard, it notes that the balance of hardships, with regard to enjoining construction do not tip decidedly in the Coalition's

favor. *See* pages 572–74 infra. Therefore, the Coalition would not prevail if the "serious questions—balance of hardships" standard were applied to this motion.

ner and extent not considered in the FEIS. For this reason, it claims that a Supplemental Environmental Impact Statement (SEIS) is required.

### 1. Definition of Project Goals

 The FEIS identifies three general goals for the Inner Harbor project:1) the enhancement of access to and transportation options at the Inner Harbor; 2) the encouragement of recreational use of the Project site and private development of adjoining properties; and 3) the enhancement of the attractiveness of the location. (FEIS, at ES–4, 5). Each of these goals is broken into more specific objectives.

For example, the first goal, enhancement of transportation options, includes creation of a harbor boat basin as an objective. (Id., ES–4). The third goal, enhancement of land uses, includes creation of "berthing opportunities for recreational and commercial maritime vessels" as an objective (Id., ES–S.) Although the "Goals" section of the FEIS does not specifically mention reconfiguration of the shoreline, the "Background" section states that the "conceptual plan" for the project includes, "[r]econfiguration of the Buffalo River Shoreline to create two new inlets to accommodate transient boats, water taxis, tour boats and naval vessels." (Id., ES–3.)

Preservation Coalition claims ESDC rejected proposals that would preserve significantly more historic resources, based on a goal not identified in the FEIS. It argues that, although increased docking facilities for small and commercial recreational craft is an identified goal, reconfiguring the shoreline to construct docking along artificial inlets is not an essential aspect of the project. Rather, Preservation Coalition argues, this particular solution to the docking issue was driven by funding considerations not germane to the project's goals. Preservation Coalition therefore claims that the rationale in the FEIS for rejecting its alternative proposals is arbitrary and capricious since it "elevat[ed] ... agency decisions about funding

to the status of goals and objectives of the Project." (Item no. 2, Plaintiff's Memorandum, at 2.)

As discussed above, under the Administrative Procedure Act, decisions set forth in the FEIS must be upheld unless they are "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Reconfiguration of the shoreline is not explicitly listed as a goal or objectives in the "goals" segment of the FEIS. However, the general description of the project, its physical setting and the "conceptual plan" for achieving the project's goals make it clear that project managers decided that reconfiguration was a necessary component of the plan. Reconfiguration is considered essential to accomplish the stated goal of increasing access by small boats and commercial crafts to the Inner Harbor, and its objective of creating docking facilities for such craft. Although Preservation Coalition advocated for a plan that would create docking facilities along the shoreline without creating a new inlet, the rejection of that plan cannot be deemed arbitrary, capricious or an abuse of discretion, and there is no basis for finding the FEIS deficient on this account. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823.

### 2. Archeology Exception

§ 4(f) of the Transportation Act provides that a Federally funded transportation project requiring the use of a public park or historic site can be approved only if there is no prudent and feasible alternative to using that site and the project includes all possible planning to minimize harm to the historic site. 49 U.S.C. § 303(c). The FEIS for the Inner Harbor Project states that it "includes all possible planning to minimize harm to [historic] resources" (FEIS, 6–10). This assertion is premised in part on the "archeology exception" to § 4(f).

Defendants' reliance on the "archeology exception" must be read in light of the

Supreme Court's interpretation of § 4(f). *Overton Park,* 401 U.S. at 411, 91 S.Ct. at 821, held that the "clear and specific directives" of § 4(f) must be read as "a plain and explicit bar" to the use of properties protected by the statute unless the prerequisites of that statute are met.

> [T]he very existence of the statute[ ] indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes.

*Overton Park,* at 413, 91 S.Ct. at 821–22. Therefore, the Court rejected the argument that the Secretary of Transportation has broad discretion to limit the applicability of the statute. *Id.* Although *Overton Park* involved a public park, § 4(f) applies with equal force to historic sites and there is no indication in the case law that such sites are accorded lesser protection under the statute.

Few reported cases have interpreted the "archeology exception." However, a First Circuit decision, *Town of Belmont v. Dole,* 766 F.2d 28 (1st Cir.1985), cert. denied 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986) [10] explains the rationale for the rule, and its limited application. In rejecting the plaintiffs' argument that the "archeological exception" subverted the purpose of § 4(f) the court reasoned:

> [t]he statute applies to "the use of ... land of an historic site of national, State, or local significance." The regulation picks out those archeological sites whose significance lies only in the data they contain that will be at least equally well preserved outside the site. Once the data is removed, the land lacks the nec-

essary "significance." The process of removal itself cannot be considered an *adverse* "use" of the site as long as it does not injure but preserves the objects in question.

*Town of Belmont,* 766 F.2d at 31–32 (emphasis in original).

The limited applicability of the "archeology exception" can be appreciated if one refers to the bases for including a historic resource in the National Register of Historic Places. National Register criteria "are worded in a manner to provide for a wide diversity of resources." 36 C.F.R. § 60.4. "Districts, sites, buildings, structures and objects that possess integrity of location, design, material, workmanship feeling and association" can be considered for inclusion in the National Register if they are "significan[t] in American history." 36 C.F.R. § 60.4, note. The regulation defines four criteria for determining the historic significance of resources.

A resource is significant under "criterion A" if it is "associated with events that have made a significant contribution to the broad patterns of our history." It is significant under "Criterion D" if it is "likely to yield [ ] information important in history or prehistory." *Id.*[11] The "archeology exception" applies if a resource is "important chiefly because of what can be learned by data recovery." 23 C.F.R. § 771.135(g)(2), i.e. if is likely to yield information. As *Belmont* explained, it does not apply,

> if the archeological items give a particular site a special "in place" historical or archeological significance. (Consider, for example, the Civil War battle artifacts at Gettysburg.)

*Id.,* at 33. Thus, a resource that met criterion A, association with events that made a significant contribution to the

---

**10.** *Town of Belmont* was authored by Supreme Court Justice Hon. Stephen G. Breyer, who was at the time a Circuit Judge on the First Circuit Court of Appeals.

**11.** The other two criteria, which do not apply to the Project site are "associat[ion] with the

lives of persons significant in our past" (Criterion B); and "distinctive characteristics of a type, period, or method of construction, or ... high artistic values." (Criterion C). 36 C.F.R. § 60.4, note.

broad patterns of American history, may not be eligible for the "archeology exception" since it would not be important chiefly because of what can be learned by data recovery.

There is a second component to the "archeology exception." It only applies if the resource "has minimal value for preservation in place." 23 C.F.R. § 771.135(g)(2). The significance of many historic resources depends on their context, and they would lose much of their significance if they were removed to another location. In this regard it is useful to clarify what it is about such resources that led Congress to accord them "paramount importance." *Overton Park*, 401 U.S. at 413, 91 S.Ct. at 822.

Certainly, historic resources can yield much information that is invaluable to historians, anthropologists, architects, and scholars in other disciplines. However, NHPA was not passed purely to assure a flow of information to scholars. That Act stresses the importance of preserving the Nation's historic artifacts "as a living part of our community life" and the need "to insure future generations a genuine opportunity to appreciate ... the rich heritage of our Nation." 16 U.S.C. § 470(b)(2), (5). It is clear that NHPA contemplated the value of enabling Americans to appreciate their heritage, by encountering historic resources in a meaningful context. Considered in that light, the logic and the limited application of the "archeology exception" is clear. As the *Belmont* decision suggests, civil war artifacts might be considered important chiefly as sources of information. However, artifacts from Gettysburg battlefield have an overriding importance because of their association with the historic battle that took place there. Thus, they

have more than "minimal" value for preservation in place.[12]

■ Preservation Coalition contends that neither component of the "archeology exception" applies to resources at the Inner Harbor Project site. It notes that the site has been the locus of historical developments of great national importance and that resources at the site are important because of their association with those developments. In particular, the Commercial Slip not only was "associated with" the development of commerce on the Erie Canal and the Great Lakes, but was actually the means of linking those trade routes. The Coalition contends that the system of streets, sidewalks and building foundations adjacent to Commercial Slip and Prime Slip also have importance since they were the site where Buffalo "was transformed within a period of decades from a kind of sleepy frontier outpost to the 10th largest city in the United States by 1860." (Testimony of David Gerber, Ph.D., T21.)[13]

Dr. Barbour's reports consistently stress the historic significance of the Inner Harbor site, and specifically the significance of Commercial and Prime Slips. In his report on "Stage II" excavations, he concluded that portions of the project area "may meet National Register Criteria A and D," an apparent reference to 36 C.F.R. § 60.4. (Barbour aff. ex. D, at 2.) As discussed above, criterion "A" applies to resources that "are associated with events that have made a significant contribution to the broad patterns of our history." Dr. Kuhn also acknowledged Commercial Slip's association with important historic developments. (K33–34.) He asserted that the "archeology exception" (which he termed the "research exception") could apply to

---

**12.** The use of Gettysburg as a point of reference in *Belmont* is well considered. It was at, and about, Gettysburg battlefield that President Abraham Lincoln gave perhaps the most succinct and eloquent explanation of how a site derives its significance from the events that occur there.

[I]n a larger sense, we cannot dedicate, we cannot consecrate, we cannot hallow this

ground. The brave men, living and dead who struggled here have consecrated it far above our power to add or detract.

Lincoln, Gettysburg address, November 19, 1863.

**13.** "T" references are to the transcript of the first day's testimony. (Item no. 37.)

such a property (K52), but did not explain why, given its historic significance, he felt that Commercial Slip was important "chiefly" because of information that it might yield.

It seems clear that the Commercial Slip wall is not important "chiefly" because of what can be learned by data collection, but that it has been associated with, and indeed spurred developments of great historic significance. The system of streets, building foundations and other resources adjacent to Commercial Slip also are important because of their association with those historic developments.

Preservation Coalition also contends that the Commercial Slip wall and related resources have considerable value for preservation in place, and that their value would be significantly impaired if they were removed from their historic situs. When consulted regarding treatment of the Commercial Slip, SHPO stressed that "the paramount importance of this resource dictates that preservation in place should be the first and primary option." (Item no. 9, ex. I.) Dr. Kuhn acknowledged that preservation in place was the preferred treatment of the Commercial Slip. (K62, 66.) He did not reconcile that position with the application of the "archeology exception." Rather, he explained that when SHPO made its "no adverse effect" determination, the remains of the Commercial Slip Wall had not yet been discovered, so that it was premature to assess the feasibility of preserving the wall in place. (K66.) That explanation begs the question whether the "archeology exception" applied to the Commercial Slip once it was actually uncovered and evaluated.

The record strongly suggests that neither criterion for the "archeology exception" applies, at least with regard to the Commercial Slip wall, and possibly with regard to other resources at the Inner Harbor Project site. At the least, it is clear that the FEIS and its exhibits contain an insufficient explanation of SHPO's and ESCD's conclusion that the "archeology exception" applies to the historic resources at the Inner Harbor site.

That the "archeology exception" was improperly applied to the Inner Harbor Project does not necessarily mean that Preservation Coalition has shown a likelihood of success on its claim that the Project fails to comply with § 4(f). Defendants argue that they complied with § 4(f) regardless of whether the "archeology exception" applies, in that there is no prudent and feasible alternative to using the Project site and they have done all possible planning to minimize harm to the site. Defendants have certainly taken care to identify historic resources and have given much thought to their preservation. However, the "archeology exception" is so embedded in their analysis of the Project's impact on historic resources that it is impossible to discern from the FEIS or its exhibits whether Defendants complied with § 4(f).

For example, SHPO and Dr. Barbour refer to the Stage III excavation as a "mitigation" measure. "Mitigation" in this context refers back to the "archeological exception," in that the excavations are defined as a means of retrieving and recording data that would otherwise be lost. This approach is consistent with the notion that the site is "important chiefly because of what can be learned by data recovery," 23 C.F.R. § 771.135(g)(2). However, if the site also is important because of its association with significant historic events, then the Stage III excavations are only the first step in mitigation, the identification of resources, and the FEIS arguably is incomplete in its analysis of how to minimize harm to the resources discovered during Stage III. This question is discussed more fully in the following segment.

The FEIS also does not address Preservation Coalition's contention that burying the Commercial Slip wall and other resources is an adverse "use" of those resources, within the meaning of § 4(f). *See, Citizen Advocates For Responsible Expan-*

*sion v. Dole*, 770 F.2d 423, 441 n. 23 (5th Cir.1985), and cases cited therein. If resources at the project site are valuable only as data, this argument is irrelevant, since the resources will arguably have yielded relevant information prior to being covered over, and conceivably will yield additional information if the wall is uncovered at some future date. However, if the resources are also significant because of their association with significant historic events, then arguably the public ought to have access to them. The FEIS, therefore, must at least discuss why there is no feasible or prudent alternative to burying the resources, and why doing so is consistent with "all possible planning" to mitigate harm.

It may well be that, upon considering the alternatives in light of the association of resources at the Project site with significant historic developments, Defendants will conclude that the present plan is the only feasible and prudent approach, and will be able to justify that conclusion. However, in its present state, the FEIS and its exhibits do not support that finding.

3. ***Supplemental EIS***

 The NEPA statute does not explicitly address the subject of a Supplemental EIS. (SEIS). *Marsh v. Oregon Nat. Resources Council*, 490 U.S. at 370, 109 S.Ct. at 1857. However, preparation of a SEIS "is at times necessary to satisfy the Act's "action-forcing" purpose." *Marsh*, at 371, 109 S.Ct. at 1858. NEPA requires that information regarding the environmental impact of a project be disseminated, to enable the public to "react to the effects of a proposed action at a meaningful time." *Id.*, citing *Robertson*, 490 U.S. at 349–50, 109 S.Ct. at 1845–46.

It would be incongruous with this approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental action, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval. *Marsh, id.*, citing *TVA v. Hill*, 437 U.S. 153, 188 n. 34, 98 S.Ct. 2279, 2299 n. 34, 57 L.Ed.2d 117 (1978). Therefore, when information which comes to light after completion of a FEIS, shows that the Project will "affect the quality of the human environment in a significant manner or to a significant extent not already considered" in the FEIS, a supplemental EIS must be prepared. *Marsh*, at 374, 109 S.Ct. at 1859.

The word "significant" is critical. An agency need not supplement an EIS every time new information comes to light. Such a requirement would make completion of any project that potentially impacted on any aspect of the environment a virtual impossibility. Even if the information suggests an impact on the environment that was not addressed in the EIS, a SEIS is not necessarily required. A SEIS is required only when new information shows that the project will affect the environment in a significant manner, or to a significant extent, that was not addressed in the EIS.

 In his affidavit, Dr. Kuhn asserts that,

none of the discoveries made during the Phase III archeological excavations were unanticipated or represent new information. All of the features identified represent archeological remains and sites noted in the Phase IA assessment and identified as targets for mitigation in the Phase III research design and [Draft] EIS. Indeed, the second condition of the SHPO's No Adverse Effect determination specifically anticipates the discovery of these remains.

(Item no. 9 ¶ 20.) Certainly the FEIS "anticipated" discovery of the Commercial Slip wall and other resources in the sense that it predicted their discovery, and it "anticipated" consultation with SHPO over those discoveries, by requiring such consultation. However, the critical question is

not whether the FEIS "anticipated" those events, but whether information obtained after the FEIS suggests that the Project will affect historic resources "in a significant manner or to a significant extent" that is not addressed in the FEIS. If so, a SEIS is required.

This Court finds that subsequent developments implicated at least three significant issues in a way that was not adequately addressed in the FEIS. These issues are: 1) SHPO's finding that the Project has no adverse effect on historic resources protected by § 4(f); 2) Defendants' determination that the Commercial Slip wall must be buried in order to preserve it; and 3) SHPO's determination that no resources, other than the Commercial Slip wall, qualify for the National Register.[14]

As discussed above, § 4(f) provides that a transportation project that uses a historic site cannot be implemented unless the agency shows that there is no feasible and prudent alternative to the use of the site and that it has done all possible planning to minimize harm to the site. 49 U.S.C. § 303(c). SHPO determined that the Inner Harbor Project would have no adverse effect on historic resources eligible for the National Register, and ESDC adopted that conclusion in the FEIS.

A project can be deemed to have no adverse effect on a historic resource under § 4(f) if the resource is not eligible for the National Register; if the resource, although eligible for the National Register, qualifies for the "archeology exception;" or if the Project does not "use" the resource. Post–FEIS events cast doubt on all of these rationales for finding no adverse effect.

The FEIS was issued in February, 1999. Dr. Barbour's crew discovered the Commercial Slip wall in May, 1999. On May 18, 1999, SHPO determined that the wall met criteria for inclusion in the National Register. (Item no. 9, ex. I.) In his testimony Dr. Kuhn acknowledged that SHPO could not have made this determination prior to the actual discovery of the wall, since until that time "we did not know if [remains of the Slip wall] existed. More importantly, even if they did exist, we did not know what shape they were in." (K66.) Therefore, SHPO could not assess the integrity of the wall, an essential component to a determination that a resource is eligible for the National Register. 36 C.F.R. § 60.4, note. The FEIS does not, and could not have addressed the § 4(f) implications of SHPO's express finding that a resource at the Inner Harbor is eligible for the National Register.

The discovery of the Slip wall also impacted on the applicability of the "archeology exception," since it was only after the wall was discovered and Defendants debated what to do with it that SHPO declared that "preservation in place should be the first and primary option." (Item no. 9, ex. I.) As discussed above, the "archeology exception" applies only if a resource has "minimal" value for preservation in place. SHPO's letter to ESDC, which post-dated the FEIS, crystallized this apparent contradiction which is not addressed in the FEIS.

In its letter to ESDC which indicated that the Commercial Slip wall is eligible for the National Register, SHPO recommended that "all prudent and feasible alternatives should be considered to avoid and preserve this resource." That language, of course, tracks the requirement of § 4(f) that a historic site may be used only if there is no feasible and prudent alternative to its use. It also implicates the requirement that a project include all possible planning to minimize harm to the wall. Following his discovery of the Commercial Slip wall, Dr. Barbour consulted with a number of experts in an effort to determine whether the wall would deteriorate if exposed to the elements. Based on the

---

**14.** Of course, a challenge under NEPA does not go to SHPO's determination regarding a historic resource, but to ESDC's reliance on SHPO's decision in the FEIS.

advice of these experts and on the feasibility study, Dr. Barbour, Dr. Kuhn project managers and ESDC agreed that the best course was to bury the wall to protect it from the elements.

The Court notes that either choice potentially implicates an adverse effect under § 4(f). If, as Defendants contend, exposing the wall to the elements would lead to its deterioration, that would clearly be an adverse effect on the wall. Conversely, burying the wall must be considered adverse to the public's access to the resource. (See: discussion of adverse effect in the context of irreparable harm, *infra*, at 573.)

Thus, the debate over whether the wall would deteriorate if left above ground, the expert advice which informed that debate, and Defendants' decision that the wall must be buried to protect it from the elements implicated environmental concerns "in a significant manner" and "to a significant extent" not considered in the FEIS. *Marsh*, 490 U.S. at 374, 109 S.Ct. at 1859.

The Coalition has presented a compelling case for reconfiguring the wall in order to preserve it above ground. It also proposes incorporating the wall into a functioning slip, instead of building a replica slip. Dr. Kuhn asserts that the Coalition's position is based on misconstruction of the applicable standards for preservation. This disagreement is also a direct consequence of the discovery of the Commercial Slip wall. The FEIS does not discuss the Coalition's proposal or Dr. Kuhn's response. Indeed it could not do so in any detail, since both sides' positions are premised in large part on information not available at the time the FEIS was issued. The debate over the proper treatment of the wall is another important issue implicated by post-FEIS discoveries that was not addressed in the FEIS.

This Court cannot and should not resolve the underlying dispute over whether Defendants complied with § 4(f), with regard to the Commercial slip wall. The FEIS does not discuss the discovery of the Commercial Slip wall, any of the information that Dr. Barbour acquired from experts regarding feasibility of preserving the Slip wall above ground, or the considerations that led SHPO and ESDC to decide that it is necessary to bury the wall. It is therefore impossible for this Court to make a reasoned decision, based on the FEIS and its exhibits, whether the Inner Harbor Project included all possible planning to mitigate harm to the Commercial Slip wall. A SEIS is therefore required to address this question.

The streets, curbs, building foundations and other resources discovered during the Stage III excavations also impact on the determination that these resources are ineligible for inclusion in the National Register. The excavations have provided a much better sense of the integrity of these resources, their spacial and functional relationship to the Commercial Slip wall, and the potential significance of the site as a cultural landscape. As Dean Melnick noted in his testimony,

> part of the process of excavation is the discovery of information and discovery of resources, and unless you know a resource is there, I don't understand how you can possibly do a determination of no [e]ffect without knowing what you are affecting.

(T233.) SHPO and ESDC may conclude that the resources aside from the Commercial Slip wall do not possess the integrity or have sufficient historic significance to qualify for the National Register, either individually, or taken together. Indeed Dr. Kuhn in his testimony stated that they are not eligible for the National Register. However, the Stage III discoveries must be at least taken into account, since they arguably affect that determination "in a significant manner" and "to a significant extent" not considered in the FEIS. *Marsh*, 490 U.S. at 374, 109 S.Ct. at 1859. The SEIS, therefore, must also address this issue.

## B. *Irreparable Harm*

The Second Circuit has "summarily rejected" the argument that "any violation of NEPA, in and of itself and as a matter of law, constitutes irreparable harm." *New York v. NRC,* 550 F.2d at 753; cf. *Town of Huntington v. Marsh,* 884 F.2d 648, 651 (2nd Cir.1989). That conclusion is consistent with recent Supreme Court decisions interpreting environmental statutes similar to NEPA. In both *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312–13, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) and *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 544, 107 S.Ct. 1396, 1403, 94 L.Ed.2d 542 (1987), the Supreme Court rejected the plaintiff's argument that a showing that the defendants violated an environmental statute necessarily required issuance of a preliminary injunction. Noting that "an injunction is an equitable remedy that does not issue as of course," *Amoco,* at 542, 107 S.Ct. at 1402, citing *Weinberger,* at 311, 102 S.Ct. at 1802, the Supreme Court reasoned that an injunction against planned construction was "not the only means of ensuring compliance with the Act," since in many instances "compliance could be obtained through the simple means of an order to the responsible [agency] to comply" with the Acts procedural requirements *Amoco,* at 543 n. 8, 107 S.Ct. at 1403 n. 8.

■ Unless a statute specifically requires that an injunction issue upon a finding of a violation, the district court should employ traditional equitable principles, including an assessment of the likelihood of irreparable harm to the moving party, in deciding whether to issue a preliminary injunction. *Amoco,* at 542–44, 107 S.Ct. at 1402–03. If construction is likely to harm the environment during the pendency of the agency action "the balance of harms will usually favor issuance of an injunction," since such harm can seldom be remedied by money damages. *Amoco,* at 545, 107 S.Ct. at 1404. However, "the court may in the public interest withhold relief," if it finds that harm to the public

from protracted delay in construction outweighs the environmental harm that the work may cause. *Weinberger,* at 312, 102 S.Ct. at 1803.

Although neither *Weinberger* nor *Amoco* dealt with NEPA, the reasoning of those cases is applicable to NEPA violations. NEPA does not explicitly provide that an injunction must issue upon a finding that its requirements have been violated. Such a practice would arguably conflict with the oft repeated observation that the district court "does not sit as a super-agency" empowered to substitute its judgment for that of the agency that prepared the FEIS. *Citizens for Balanced Environment v. Volpe,* 650 F.2d 455, 460 (2nd Cir.1981), citing *County of Suffolk,* 562 F.2d at 1383. If an injunction were required in each instance where the FEIS was defective, the court would be required to fashion a remedy based on its notion as to the proper outcome, rather than having discretion to return the matter to the agency to more fully explore its options. Therefore,

> [a]lthough the procedural requirements of NEPA must be followed scrupulously ... it remains within the sound discretion of a district court to decline an injunction, even where deviations from prescribed NEPA procedures have occurred.

*Town of Huntington,* 884 F.2d at 653, quoting *Conservation Soc. of Southern Vermont v. Secretary of Transportation,* 508 F.2d 927, 933–34 (2nd Cir.1974), vacated on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975).

■ This Court must therefore determine whether construction at the Inner Harbor Site is likely to harm a legally protected interest of Preservation Coalition and, if so, whether that harm is irreparable. In this case there are three harms alleged by Preservation Coalition:

1) harm to its members' access to the Commercial Slip wall if it is buried;

2) harm to the Coalition's plan for incorporating the Commercial Slip wall into the Project's design for a working slip; and

3) harm to other resources that may be eligible for the National Register. As to each harm, this Courts analysis differs, as discussed below.

### 1. *Harm to Members' Access to the Commercial Slip Wall*

Defendants agree that the Commercial Slip wall is eligible for the National Register. The wall therefore is subject to the protection of § 4(f). *Arizona Past and Future Foundation v. Lewis,* 722 F.2d 1423, 1429 (9th Cir.1983), citing 23 C.F.R. § 771.135(d). Since Defendants plan to bury the wall in order to protect it from the elements, the construction planned at the site does not create an imminent risk of physical harm.

"Harm", however, also can mean denial of access to a protected resource. *Coalition Against a Raised Expressway v. Dole,* 835 F.2d 803, 812 (11th Cir.1988) (negative impact "includes reduction of access to the protected area"); *Monroe Cy. Conservation Council v. Adams,* 566 F.2d 419, 424–25 (2nd Cir.1977) (restricted access to park is a negative impact from proposed highway.) *See* also, *Citizen Advocates for Responsible Expansion,* 770 F.2d at 441 n. 23 and cases cited therein. Therefore, Defendants' plan to bury the Commercial Slip wall can be considered harm to Preservation Coalition's legally protected interest in its members access to, and enjoyment of the Commercial Slip wall.

Under § 4(f), a project such as the Buffalo Inner Harbor Project can adversely affect a historic resource if there is no prudent and feasible alternative, and it includes all possible planning to minimize harm. 49 U.S.C. § 303(c). Here, the decision to bury the commercial slip wall was based on an analysis of the stones that make up the wall, and the likely destructive effect of exposing those stones to the elements. If the analysis is accurate, burying the Commercial Slip wall may well be the only feasible and prudent option. On the other hand, Preservation Coalition contends that the stones will last thousands of years if they are exposed, and that the "life" of the Commercial Slip wall can be extended by the simple expedient of reconfiguring the stones, so that they lie the way they do in nature.

Although Defendants' plan for burying the Commercial Slip wall permits its exposure at some later date, Preservation Coalition contends that its members will suffer irreparable harm if the wall remains buried during the SEIS process. Certainly, denial of access to the Commercial Slip wall while it is buried will implicate some degree of harm to Plaintiff's interest in access to the wall. In this Court's view though, such harm is greatly outweighed by the potential harm to Defendants' interests if construction is enjoined. Specifically, Defendants assert that the Buffalo Inner Harbor Project will lose thousands of dollars on a daily basis if construction ceases at this point. They also assert that a prolonged hiatus would threaten their ability to ever complete the Project according to plan and, perhaps just as importantly to interested others, a prolonged delay in construction could impact on commercial development of the Project site and adjoining properties. As a result, it is this Court's conclusion that Plaintiff has failed to prove that irreparable harm to its members' interest in access to the Commercial Slip wall outweighs harm to Defendants' interest in continuing construction at the Buffalo Inner Harbor Project site.

### 2. *Harm to the Proposal to Incorporate Commercial Slip Wall into a Functional Slip*

Interested individuals and groups have proposed a number of competing plans for restoration and utilization of the Commercial Slip wall, as part of the Inner Harbor

Project.[15] Preservation Coalition's proposal for incorporating the wall into a functioning slip is one such plan. As discussed earlier, it is premature for this Court to address the merits of competing proposals for either preservation or restoration of the Commercial Slip wall. That question must be addressed in the SEIS process.

Preservation Coalition contends that, if construction is not enjoined pending completion of the SEIS, its interest in advocating for its proposal for use of the wall will be irreparably harmed. Preservation Coalition argues that Defendants are committed to a particular outcome, and that they will be biased toward that outcome when evaluating alternative proposals. It also contends that the next phase of construction involves work on a proposed Replica Slip, which will necessarily preclude use of the Commercial Slip wall as a structural component in a working Slip.

This Court rejects Preservation Coalition's assertion that Defendants will be biased against its proposal when they evaluate alternatives. There is simply no evidence to suggest that defendants will proceed in bad faith, or will maneuver the timing of the SEIS to derail any proposal other than theirs. Indeed, Defendants appear to have made a diligent and conscientious effort to identify and evaluate historic resources, to assess likely harm to those resources and to consider alternative approaches to the Buffalo Inner Harbor Project that might minimize such harm. In particular, Dr. Barbour appears to have been painstaking in his efforts and candid in his reports throughout each stage of his archeological investigation; SHPO appears to have endeavored to properly advise ESDC as to ways that harm to cultural resources might be mitigated; and ESDC appears to have acted forthrightly on SHPO's recommendations. Although Preservation Coalition has rightly contested some assumptions made by Defendants in their evaluation of resources and decisions on how to proceed, there is no credible evidence that any of the Defendants have approached their obligations under the law other than in a fully responsible manner.

There is, however, a risk that construction work on a Replica Slip will reach a point where, objectively, it is unrealistic or impossible to incorporate the Commercial Slip wall into a functioning slip. That risk is partly a consequence of the timing of this lawsuit and of the Preliminary Injunction motion. The Inner Harbor Project FEIS was completed and made available for public review in February, 1999. The Record of Decision was issued on June 22, 1999. Although the Complaint in this Action was filed October 6, 1999, the Motion for a Preliminary Injunction was not filed until December 7, 1999. Had Plaintiff filed the Preliminary Injunction Motion sooner, this Court would likely have been in a position to issue its Order directing Defendants to prepare a SEIS much sooner, and the SEIS process might have been substantially complete by now.

In evaluating the likelihood of irreparable harm here, it is important to clarify the nature of Preservation Coalition's interest. There is a qualitative difference between an interest in physically preserving a historic resource, and an interest in advocating for a particular mode of presenting that resource to the public. § 4(f) declares that preservation of historic resources is of paramount importance, and NHPA was passed with the specific intention of identifying such resources and assuring their continued existence. Thus there can be no debate as to *whether* a historic resource ought to be physically preserved, if it is possible to do so. The goals of NHPA and § 4(f) necessarily imply that, if possible, the public should have access to historic resources, so that a treatment of the resource that permits such access is preferable to a treatment that denies access, if the former treatment is feasible.

15. One such proposal was submitted to this Court by a non-party. (Item no. 45.)

However, there is nothing in the text or goals of either § 4(f) or NHPA that can be read as expressing a preference for the particular use of the Commercial Slip wall that Preservation Coalition proposes. There are good faith disagreements both as to the feasibility of Preservation Coalition's proposal, vis-a-vis defendants' plan, and the relative authenticity of each approach. Thus, while Preservation Coalition has an unequivocal, legally protected interest in assuring the physical preservation of the Commercial Slip wall and public access to the wall, its interest in making the wall a part of a functioning slip is a contingent one. Specifically, Preservation Coalition has an interest in advocating for this particular treatment of the wall, in the context of the EIS process.

Under Second Circuit law, a district court is not required to enjoin construction pending completion of an EIS simply because a particular proposal might be preempted during the time it takes to complete the EIS. On the other hand, an injunction to maintain the status quo pending an administrative proceeding has been upheld where a plaintiff's "victory ... might well prove Pyrrhic" in the absence of such relief. *Westchester Lodge 2186 v. Railway Express Agency*, 329 F.2d 748, 753 (2nd Cir.1964). In the NEPA context, an injunction may be required if,

> the action sought to be enjoined would [produce] an irreversible and irretrievable commitment of resources that would [make] it virtually certain that the [SEIS], even if eventually completed, would never serve the purpose it was intended to serve that of insuring that federal projects having a significant effect on the environment might proceed only on the basis of a "careful and informed decision-making process."

*New York v. NRC*, 550 F.2d at 754, quoting *Scherr v. Volpe*, 466 F.2d 1027, 1034 (7th Cir.1972). In short, the function of such an injunction would be to insure the integrity of the decision-making process so as to assure that the SEIS is not simply a charade that will rationalize a preordained conclusion.

Although there is some risk that construction during the pendency of the SEIS will affect the viability of Preservation Coalition's proposal for incorporating the Commercial Slip wall into a functioning slip, that risk is outweighed by the risk of harm to defendants' interests, if construction is enjoined. The Inner Harbor Project involves a broad range of commercial, recreational, and aesthetic goals, all of which could be jeopardized if the project were halted at this critical stage.

Based on the facts before it, therefore, this Court finds that hardship to the Defendants if construction is enjoined significantly outweighs the risk of harm to Preservation Coalition's interest in advocating for the incorporation of Commercial Slip wall into a functioning slip.

That finding does not end this Court's inquiry into the necessity for preliminary injunctive relief. The risk that construction will preempt alternative plans for the Commercial Slip Wall is directly related to timing of the SEIS. The longer it takes to complete the SEIS, the greater the risk that alternatives will be preempted. In deciding that an injunction against the Army Corps of Engineers was not required in *Town of Huntington*, the Second Circuit made the following observation.

> [W]e note the representation made by the Corps at oral argument concerning the timetable for generating an EIS, and trust that this effort will be pursued expeditiously. We have no reason to doubt the Corps' *bona fides* in this regard, but simply note that this factor has a bearing on the overall equities which the district court must consider.

884 F.2d at 654, citing *Weinberger*, 456 U.S. at 320, 102 S.Ct. at 1807.

Because the risk to Preservation Coalition's interest increases with the passage of time, Defendants are directed to initiate and complete the SEIS process with all deliberate speed. Once underway, this

Court intends to monitor the progress of the SEIS process throughout. It has the inherent authority to fashion an equitable remedy, and it will exercise that authority to condense the time required to complete the SEIS, provided that the interests of justice permit and so require. Lastly, if it appears that the process is unnecessarily being prolonged, this Court will reconsider Plaintiff's request that it enjoin construction pending completion of the SEIS.

### 3. *Harm to Other Resources*

Preservation Coalition claims that streets, sidewalks, curbs, foundation walls, sidewalks and other resources in the vicinity of the Commercial Slip qualify for the National Register, both individually and as part of cultural landscape. Defendants disagree, asserting that these resources lack the integrity required to qualify for the National Register.

The present record before this Court does not enable it to decide whether exclusion of these resources from consideration for the National Register is arbitrary and capricious. Therefore, Defendants must reconsider in the SEIS:

1) whether these resources are eligible for the National Register and therefore protected under § 4(f) of the Transportation Act and

2) If so, what mitigation is required.

In this Court's opinion, the pending stage of construction at the Buffalo Inner Harbor Project site at this time is not likely to cause irreparable harm to these resources. According to defendants, this stage of the construction may entail covering over some of the resources that have been exposed during the stage III excavation, and it will certainly keep other resources, which could be exposed under the ground. Additionally, Defendants' counsel aver that no buildings or other permanent structures are scheduled to be built over this part of the Project site in the immediate future. If it is later determined that any of the resource are eligible for the National Register, it does not appear that pending construction will preempt incorporating these resources into the Project landscape at a later time.

Based on the above considerations, it is clear that Plaintiff has not made a sufficient showing that its interest in resources other than Commercial Slip Wall will be irreparably harmed unless this Court immediately enjoins construction at the Project site. Accordingly, this Court denies Plaintiff's motion for a Preliminary Injunction involving such resources. However, because of the risk that the Preservation Coalition's protected interests tied to the FEIS process could be irreparably harmed if that process is unduly delayed, this Court orders that Defendants proceed with all deliberate speed, in their preparation of a draft SEIS, in the public comment period and in completing the SEIS.

### *IN SUMMARY*

It is important to put the practical consequences of the Decision and Order in proper perspective. This summary is an attempt to do so in a snapshot fashion. In short, all of the cultural resources that Preservation Coalition seeks by this lawsuit to preserve will remain intact during the Supplemental Environmental Supplemental Process called for in this Court's Decision. Those same resources can be retrieved and incorporated into the landscape of the Inner Harbor Project if that is deemed the proper outcome in the Supplemental Environmental Impact Statement.

Defendants now must expeditiously prepare a draft Supplemental Environmental Impact Statement that will inform the public about the significant information that has come to light since the Final Environmental Impact Statement was completed—namely the Stage III archeology excavation, the discovery of the Commercial Slip wall, the experts' opinions on the durability of the wall, and the decision to bury the wall in order to preserve it. The public then will have the opportunity

to review the draft Supplemental Environmental Impact Statement and to consider the rationale for burying the Commercial Slip wall. It may also consider whether specific and identifiable resources other than Commercial Slip ought to be incorporated into the Inner Harbor Project. Moreover, as part of the Supplemental Environmental Impact Statement process, Preservation Coalition and others who are interested will have an opportunity to urge the adoption of their particular visions or plans for the Inner Harbor Project. Any completed Supplemental Environmental Impact Statement will include Empire State Development Corporation's response to any such proposals put forth for adoption. This process embodies the purpose of the Environmental Impact Statement in attempting to reconcile the competing goals of developing the Inner Harbor Project site, and preserving historic resources at the site.

Because time is of the essence, Defendants are directed to initiate and complete the Supplemental Environmental Impact Statement process with utmost speed. Let there be no doubt, this Court will not hesitate to invoke its inherent equitable authority to assure that is done. Although Defendants have expressed a preference to avoid the Supplemental Environmental Impact Statement process, the requirement that a Supplemental Environmental Impact Statement be expeditiously prepared while construction proceeds is, in this Court's judgment, the least intrusive means of insuring that the requirements of NEPA, NHPA and § 4(f) are met.

From this proper perspective, the outcome of this Decision ought not be viewed as either a "Pyrrhic" victory for Preservation Coalition or as a complete vindication of Defendants' actions. It simply is a safeguarding of the public's interest.

### CONCLUSION AND ORDER

IT HEREBY IS ORDERED, that Plaintiffs Motion for Preliminary Injunction is GRANTED in Part and DENIED in Part for the above stated reasons.

FURTHER, that Plaintiff Preservation Coalition's request that this Court enjoin construction on the Inner harbor Project is DENIED.

FURTHER, that Defendants are ordered to prepare a Supplemental Environmental Impact Statement (SEIS) as described in this Decision, and to comply with the following requirements:

1. The SEIS must address and discuss those events which occurred, and information that became available subsequent to the Final Environmental Impact Statement (FEIS), which affect environmental issues in a significant manner or to a significant extent not already considered in the FEIS.

2. In particular, the SEIS must address the following issues, in light of events and information subsequent to the FEIS:

a) Applicability of the "archeology exception" to the Commercial Slip wall, and to other existing historic resources, if any, at the Inner Harbor Project site.

b) Whether the Commercial Slip wall must be buried in order to protect it from the elements.

c) Whether rehabilitation, restoration or reconfiguration of the Commercial Slip wall is a reasonable and prudent alternative to burying the wall.

d) Whether any resources at the Inner Harbor project site, other than Commercial Slip are eligible for inclusion in the National Register, either individually or collectively.

3. The FEIS must also address and discuss whether proposals submitted by Preservation Coalition, and/or by other entities or individuals for the rehabilitation, restoration or reconfiguration, and/or utilization of the Commercial Slip Wall, in the plan for the Inner Harbor Project are reasonable and prudent.

FURTHER, the parties shall appear before this Court on Tuesday, April 4, 2000 at 11:00 a.m. in Part IV, United States Courthouse, 68 Court Street. Buffalo, N.Y. for a status conference and shall be prepared to discuss in detail the time frame for:

1. The draft SEIS;

2. Public hearings on the draft SEIS;

3. Completion of the SEIS; and

4. Shortening the time periods as may appear in the relevant regulations; and

5. Reporting on the timetable for work on the portion of the Inner Harbor Project involving the Replica Slip.

SO ORDERED.